Marvyn GOULD, Executor of the Estate of J. Donald Rogasner, and J. David Pincus, on behalf of themselves and all others similarly situated, Plaintiffs,

Mary S. McCord and Charles T. McCord, Jr., Intervening Plaintiffs,

v.

AMERICAN HAWAIIAN STEAMSHIP COMPANY et al., Defendants.

Civ. A. No. 3707/3722.

United States District Court, D. Delaware.

Nov. 10, 1970.

William Prickett and Rodman Ward, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, Del., Harold E. Kohn and Aaron M. Fine, of Harold E. Kohn, P. A., Philadelphia, Pa., for plaintiff Gould and all those similarly situated and for intervening plaintiffs.

Ralph F. Keil, of Keil & Keil, Wilmington, Del., for plaintiff Pincus.

S. Samuel Arsht and William O. La-Motte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Richard Nolan and Christopher Crowley, of Davis, Polk & Wardwell, New York City, for defendant R. J. Reynolds Tobacco Co.

David F. Anderson and Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, Del., John W. Castles, III, and Roger C. Ravel, of Lord, Day & Lord, New York City, for defendants American-Hawaiian Steamship Company, National Bulk Carriers, Inc., Litton Industries, Inc., Monroe International Corporation Retirement Plan Trust, Daniel K. Ludwig, Hal A. Kroeger and Joseph T. Casey.

Henry M. Canby, of Richards, Layton & Finger, Wilmington, Del., W. Foster Wollen, of Shearman & Sterling, New York City, for defendants Malcolm P. McLean, James K. McLean, Clara L. McLean, Disque D. Deane, Edward A. Hirs, James T. Murff and Beverly R. Wilson, Jr.

## OPINION

WRIGHT, Chief Judge.

This case is before the Court upon plaintiffs' motion for a partial summary judgment on the issue of liability under the Securities Exchange Act of 1934, Sections 10(b) and 14(a), 15 U.S.C. Sections 78j(b) and 78n(a) and certain defendants' cross motion for summary judgment. The relevant facts are found in the pleadings, defendants' answers to interrogatories, oral depositions, affidavits, and other documents submitted to the Court.

## I. FACTUAL BACKGROUND.

This litigation is an outgrowth of the merger of McLean Industries, Inc. ("McLean") into R. J. Reynolds Tobacco Company ("Reynolds") which was approved by the directors of these two companies and by their stockholders on May 13, 1969. Defendants are (1) Reynolds and McLean, (2) the members of the board of directors of McLean all of whom voted to approve the merger, and (3) certain stockholders who are alleged to have received favored treatment under the merger agreement, i. e., American-Hawaiian Steamship Company ("American-Hawaiian"), National Bulk Carriers, Inc., ("National Bulk"), Litton Industries, Inc., ("Litton"), Monroe International Corporation Retirement Plan Trust ("Monroe"), and Hal A. Kroeger (sometimes hereafter referred to with no pejorative intent as "the favored defendants"). Plaintiff Gould is the executor of the estate of a former stockholder of McLean, and intervening plaintiffs are likewise former stockholders of that company.

The complaint was filed as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all common stockholders of McLean other than the defendants.[1] It contains four counts. Count I alleges that the merger agreement between McLean and Reynolds was detrimental to the plaintiffs' class in that it provided that the favored defendants were to receive $50 per share for their common stock in McLean, whereas all other common stockholders of McLean would receive for each share thereof one share of newly issued Reynolds $2.25 Convertible Preferred Stock allegedly worth substantially less than $50 per share; that in approving the agreement of merger, defendants, other than Reynolds and McLean, either breached the

---

1. On February 27, 1970, this Court determined and ordered that plaintiffs' action was to be maintained as a class action.

fiduciary duty which they owed to McLean stockholders or participated in that breach; and that the actions of defendants were part of a scheme to defraud plaintiffs' class, carried out through interstate commerce, the mails and the New York Stock Exchange in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 thereunder; and that this scheme was carried out by the dissemination of proxy statements containing material omissions designated to effectuate the scheme to defraud plaintiffs' class.

Count II is brought derivatively on behalf of McLean, incorporates the material allegations of Count I and alleges that McLean's proxy materials violated Section 14(a) of the 1934 Act and Rule 14a–9 thereunder.

Count III, based on pendent jurisdiction, alleges breaches of common law fiduciary duty by reason of the matters alleged in Count I.

Count IV is identical to Count III except that it bases jurisdiction on alleged diversity of citizenship and the requisite monetary amount.

This Court has jurisdiction pursuant to Section 27 of the 1934 Act, 15 U.S.C. Section 78aa.

Initially, the complaint prayed for an injunction against the merger, for damages, and such other relief as may be just. No temporary injunctive relief was sought by plaintiffs, and the defendants consummated the merger. Thereafter the complaint was amended to substitute a prayer that the merger be set aside.[2]

All defendants have filed answers denying plaintiffs' allegations of illegality, including the allegations that the merger terms were unfair and that the proxy material was incomplete or misleading.

At all material times the pertinent relationships between the various defendants were essentially as follows. Mr. McLean was president of McLean Industries and a member of its board of directors; Ludwig, Kroeger, Casey, Wilson and the other individual defendants were members of the McLean board of directors. Ludwig was the sole owner of National Bulk. It owned Berkshire Industries, Inc., which in turn owned 90% of American-Hawaiian. Kroeger was a director and chairman of the board of American-Hawaiian. Casey was the senior vice-president of Litton and a member of the investment committee of Monroe, a Litton pension fund.[3]

According to the McLean proxy statement dated April 10, 1969, there were 10,783,490 shares of McLean stock outstanding: 10,632,000 shares of common stock, 146,925 shares of First Preferred $4 Series and 4,565 shares of Cumulative Preferred stock.

The various defendants associated with McLean were also stockholders:

| Name | Shares of McLean Common Stock Owned | Percentage of McLean Common Outstanding |
|---|---|---|
| Mr. McLean | 3,609,473 | 33.9% [5] |
| Litton | 965,000 [4] | 9.1% |
| Monroe | 85,000 [4] | 0.8% |
| National Bulk | 250,000 | 2.4% |
| American-Hawaiian | 1,000,000 | 9.4% |
| Mr. Kroeger | 4,000 | 0.0% |
| | 5,913,473 | 55.6% |

In addition, Mr. McLean owned 18,383 shares and Beverly R. Wilson, Jr., owned 50 shares of $4 First Preferred.

During January and February of 1969, Mr. McLean negotiated with Reynolds and reached an agreement in principle that Reynolds would make a tender offer for all the common stock of McLean, offering $50 per share or a package con-

---

2. At a hearing held on December 29, 1969, plaintiffs' counsel stated of record that plaintiffs withdrew their request that the merger be set aside and would seek only damages.

3. The investment committee corresponds to the board of directors of a corporation.

4. On April 30, 1969, prior to the merger, Litton sold 100,000 of its shares to Monroe, thus changing their totals accordingly. See Plaintiffs' Brief at 6; Certain Defendants' Brief at 58.

5. Shares owned by Mr. McLean's family increase the figure to approximately 40%.

sisting of a $40 principal amount, 20-year 7% Reynolds Debenture and ⅝ of a warrant to purchase Reynolds common at $47.50 per share. Mr. McLean and McLean's investment banker evaluated the debenture and warrant package as being worth approximately $50.

Subsequent to this tentative agreement, Mr. McLean spoke with Ludwig (the principal in the National Bulk group) and Casey (representative of Litton and Monroe) and was told that neither group would accept Reynolds securities for their shares, although both indicated that they would accept $50 cash and would not oppose the transaction.[6]

This Reynolds offer, however, was short-lived. In late February, Reynolds exercised its option to withdraw its offer[7] due to the submission in Congress of the "Mills Bill". This proposed legislation, the parties agreed, would have resulted in adverse tax consequences unacceptable to Reynolds if the tender offer were effectuated.

In early March, Reynolds and Mr. McLean resumed discussions in an effort to find an alternative method of completing the transaction. During these discussions, the deal was recast in the form of a statutory merger. Reynolds was unwilling to offer a cash alternative to all stockholders; they were to receive one share of Reynolds $2.25 Convertible Preferred for each McLean share. The favored defendants, however, were to receive $50 in cash per share as Ludwig and Casey had consistently requested.

The McLean Board of Directors met on March 20, 1969, to consider the merger proposal. They were presented with an opinion from McLean's investment banker evaluating the proposed issue of Reynolds Convertible Preferred at approximately $50 per share. The McLean Board—with Ludwig, Kroeger, and Casey present and voting—voted unanimously to approve the merger with full knowledge that only the favored defendants were to receive cash for their shares.[8]

On March 25, 1969, a number of agreements were executed between the favored defendants and Reynolds. Litton, Monroe, National Bulk, American-Hawaiian and Kroeger each signed agreements with Reynolds to the effect that they each would sell and Reynolds would buy all their common shares of McLean for $50 per share subject to certain conditions. Among other things, Reynolds had the option of terminating its obligation to buy the shares if the favored defendants did not vote their shares in favor of the merger. The favored defendants did not agree to vote for the merger either as directors or as shareholders. Reynolds' obligation to buy the shares was also conditioned upon the execution and effectiveness of certain consent agreements between companies affiliated with Litton, companies affiliated with

6. There is a good deal of uncertainty in the record as it presently stands as to whether the favored defendants approved or merely acquiesced in the transaction. It is also unclear, in various conversations with Mr. McLean, whether they were speaking as directors or as shareholders.

7. Prior to February 25, 1969, Reynolds' attorneys drafted purchase agreements between Reynolds and each of the following: Litton, Monroe, American-Hawaiian and National Bulk. These agreements were never executed because of the withdrawal of the Reynolds offer. Under the agreements the respective sellers agreed to accept the $50 per share for their stock, to hold it until after the requisite stockholder vote approving the merger. Reynolds had the option under the agree-

ment to withdraw its offer if the other party failed to vote its shares in favor of the merger, if adverse tax legislation was introduced in Congress or for other reasons not pertinent here. It is important to note that under these agreements and the first Reynolds offer at the end of February: (1) all McLean shareholders were due to receive the same alternative as the favored defendants and (2) the favored defendants had not agreed to vote their shares in favor of the merger.

8. It is worth noting that under the terms of the merger agreement, the Reynolds Board or the McLean Board could terminate the agreement if holders of more than 15% of the stock perfected their appraisal rights. McLean Proxy, Exhibit A, p. 16.

National Bulk, McLean and Reynolds by which the Litton group and the National Bulk group waived their rights (under 1964 and 1967 financing agreements with McLean) to veto any merger or similar transaction of McLean. Two such consent agreements were executed on the same date.

On April 10, 1969, McLean sent to all McLean stockholders proxy materials including Mr. McLean's two-page letter giving notice of the combined annual and special stockholders meeting on May 13, 1969, for the principal purpose of voting upon the proposed merger with Reynolds. The cross motions for partial summary judgment are concerned solely with alleged misstatements and omissions in these proxy materials.

This lawsuit was filed on May 6, 1969, and some or all of the defendants were made aware of it prior to May 13, 1969. At the May 13th meeting of McLean stockholders, the merger agreement was approved by the following vote:[9]

|  | Common | First Pref. | Cum. Pref. |
|---|---|---|---|
| Voting in Favor of Merger | 8,332,239 | 90,887 | 3,130 |
| Voting Against Merger | 185,230 | 3,712 | 94 |
| Not Voting | 2,114,531 | 52,336 | |
| Demanded Appraisal | 223,136 | | |

Thereafter, the merger was consummated.

Plaintiffs' motion for partial summary judgment as to liability is based upon the claim that the April 10, 1969, McLean proxy materials relating to the merger were materially false and misleading as a matter of law in the following particulars:

**9.** The merger required the favorable vote of two-thirds of all classes of McLean stock. and a majority of the First Preferred.

**10.** Rule 10b–5, 17 C.F.R. § 240.10b–5:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(1) The proxy materials stated that the favored defendants "have agreed to vote for the merger."

(2) The proxy materials stated that purchases of the shares of the favored defendants at $50 per share in cash "will not be tax-free transactions for the sellers, whereas it is anticipated that the exchange of stock in the merger will be tax free for other holders of McLean Common Stock."

(3) The proxy materials did not disclose an alleged "veto power" which the Litton group and the National Bulk group had over any McLean merger.

(4) The proxy materials did not disclose an alleged "conflict of interest" between the favored defendants and other McLean shareholders and the fact that directors of McLean affiliated with the Sellers voted for the merger at a McLean board meeting on March 20, 1969.

The defendants deny that the questioned statements or omissions are false or misleading and argue that even if they are found to be false or misleading they are immaterial as a matter of law.

## II.   APPLICABLE STATUTES, RULES AND LEGAL STANDARDS.

Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 as amended are well known and need not be reiterated here: § 10(b) deals with manipulative and deceptive devices used in connection with a purchase or sale; § 14(a) concerns proxies that contravene rules of the SEC. The pertinent Commission rules that are derived from these statutes are set out in the margin.[10]

(a) To employ any device, scheme, or artifice to defraud.
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or

█ Since the plaintiffs here claim liability under both sections by reason of the alleged proxy misrepresentations, the Court must needs concern itself with the relationship between the two sections in cases involving material misrepresentations or omissions in proxy statements soliciting stockholder approval of a merger or some other transaction that would be considered "in connection with the purchase or sale of any security." [11]

The Supreme Court considered the relationship of § 10(b) and § 14(a) in cases involving misrepresentations in proxy statements that led to a "purchase or sale" in SEC v. National Securities Inc., 393 U.S. 453, 468–469, 89 S.Ct. 564, 572–573, 21 L.Ed.2d 668 (1969). There the Court stated:

> Respondents' alternative argument that Rule 10b–5 does not cover misrepresentations which occur in connection with proxy solicitations can be dismissed rather quickly. * * * [T]he existence or nonexistence of regulation under § 14 would not affect the scope of § 10(b) and Rule 10b–5. The two sections of the Act apply to different sets of situations. Section 10(b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale. * * * Accordingly, we find no bar to the application of Rule 10b–5 to respondents' misstatements in their proxy materials.

The applicability of Rule 10b–5 was important in the *National Securities* case because § 14 of the Act was not applicable to the insurance companies in question by reason of the exemption in the McCarran-Ferguson Act. Section 14 is obviously applicable to the instant case, however, and this Court believes that on this motion plaintiffs' claims are better laid under § 14, which requires no proof of "actual reliance" by plaintiffs on the alleged misrepresentations. If, as now appears to be the proper interpretation of § 10, proof of some sort of "intent to defraud" is no longer required, [see, e. g., SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–855 and n. 22 (2d Cir. 1968)] the only other discernible difference in the legal standards would seem to be that Rule 10b–5 states that statements must be "untrue" to be actionable (although omissions may be "misleading") whereas Rule 14a–9 prohibits "false or misleading" statements (as well

would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Rule 14a–9, 17 C.F.R. § 240.14a–9:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necesary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

11. The Court notes in passing that there is no question that a proxy statement soliciting approval of a merger falls within the ambit of Rule 10b–5. A merger or exchange of stock is a "purchase or sale" under these circumstances and most others. See, e. g., Kahan v. Rosenstiel, 424 F.2d 161, 170–173 (3rd Cir. 1970), cert. den. sub nom. Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) [and cases cited therein]; Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 797–798 (2nd Cir. 1969); Dasho v. Susquehanna Corp., 380 F.2d 262, 266–267 (7th Cir. 1967); Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965).

as omissions). This may well be a distinction without the slightest bit of difference, but if there is a difference, § 14 is more favorable to plaintiff than § 10.[12]

For the remainder of this opinion, the Court will consider the plaintiffs' claims as arising solely under § 14(a) and Rule 14a–9 without prejudice to plaintiffs' right to assert claims under § 10 and Rule 10b–5 at a later point.

In light of the foregoing analysis, the sole question before the Court requiring interpretation of § 14(a) and Rule 14a–9 on these motions are: (1) whether the attacked statements in the McLean proxy materials are false or misleading or the alleged omissions are necessary in order to make the statements made not false or misleading; and (2) whether the misstatements or omissions are "material."

The first quesetion is one of fact, and is discussed in Part III of this opinion, infra. Prior to that, however, the Court will attempt to set out the elusive standards for the granting of summary judgment on the issue of materiality.

The Court takes its standard of materiality from the Supreme Court's recent decision in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621 (1970):

> Where the misstatement or omission in a proxy statement has been shown to be "material," as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express

terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a). (Footnote omitted, emphasis in original)

The expressions "might have been considered important by a reasonable stockholder" and "significant *propensity* to affect [i. e., influence] the voting process" seem to embody a modest liberalization of the standard often enunciated in district courts. Some courts have held that a fact is material if its misstatement or omission *would influence* a stockholder's vote. See, e. g., Walpert v. Bart, 280 F.Supp. 1006, 1011 (D.Md.1967); Evans v. Armour & Co., 241 F.Supp. 705, 709 (E.D.Pa.1965); Restatement Torts, § 538(2) (a). The *Mills* materiality standard, however, followed the view of two Circuit Courts of Appeal. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2nd Cir. 1965); Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963); but see, General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2nd Cir. 1968) ("a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course.")

Both sides contend that the Court *cannot* grant summary judgment for the other side; plaintiffs on the grounds that they have a right to take the issue of materiality to the jury and the defendants (apparently) on the ground that there are disputed issues of fact.

---

12. In Swanson v. American Consumers Inc., 415 F.2d 1326, 1331–1332 (7th Cir. 1969) the Court indicated that the causation requirement under § 10(b) was less stringent than that applicable to § 14(a) cases. Any such distinction, however, was demolished by the Supreme Court's reversal of another Seventh Circuit case, Mills v. Electric Auto-Lite Co.,

396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), reversing 403 F.2d 429 (7th Cir. 1968). The causation issue in the instant case is discussed in Part IV of this opinion, infra. In this opinion it will serve no useful purpose to distinguish "reliance" and "causation" under Rule 10b–5.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The burden of producing undisputed evidence that entitles a party to summary judgment is on the movant, and the party opposing the motion "is entitled to all favorable inferences which can be drawn from the evidence." Cram v. Sun Insurance Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967). See generally: First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288–290, 88 S. Ct. 1575, 20 L.Ed.2d 569 (1968); 6 Moore, Federal Practice ¶ 56.15 [3] (2nd Ed. 1966). Thus, if the facts are not in dispute, the question arises whether the inferences that can be drawn from those facts point to only one conclusion—in favor of the moving party; otherwise, the motion for summary judgment must be denied.

In the type of case presently before the Court, the difficult question of the materiality of the alleged misstatements presents peculiar problems for any attempt to decide a case on a motion for summary judgment. See, Dolgow v. Anderson, CCH Fed. See L.Rep. No. 92,-763 (2nd Cir. Sept. 2, 1970). The Court agrees with the Fourth Circuit's evaluation of the proper standard for determination of a case such as this on summary judgment in Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970):

> Generally the issue of materiality, resting as it does upon the reaction of a "reasonable man," cannot be decided by summary judgment. Rogen

v. Ilikon Corp., 361 F.2d 260, 265 (1st Cir. 1966). But here the discrepancies in basic data are so large, and the facts misrepresented and withheld are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality. Since the underlying facts and the inferences to be drawn from these facts are free from controversy, summary judgment was appropriate.

■ Plaintiffs have asked for a jury trial in this case, and the Court believes that they and the class they represent have a constitutional right to a jury trial.[13] This does not mean, however, that the Court could not properly decide in favor of the defendant on a motion for summary judgment. "Materiality" is a mixed question of law and fact, and where "reasonable minds cannot differ" about an alleged misleading statement or omission's importance the Court may decide the case on a motion for summary judgment. The *Mills* case itself was decided by the District Court on a motion for summary judgment, and the Supreme Court indicated no disapproval of that procedure. If reasonable minds would all agree that all alleged deficiencies in the McLean proxy were "so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a),"[14] this Court could and would grant summary judgment for the defendants.

As will become apparent in the next part of this opinion where the specific allegations of misleading statements and omissions in the McLean Proxy are discussed, the Court believes that the plaintiffs have failed to establish that the discrepancies are "so large" or that the facts withheld are "so obviously important to the investor" that reasonable minds could not differ on the question. Needless to say, the defendants have sim-

---

13. See the thoughtful and scholarly opinion of Judge Mansfield on this question in Richland v. Crandall, 259 F.Supp. 274 (S.D.N.Y.1966).

14. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616 (1970).

ilarly failed to sustain this heavy burden of proof and their cross-motion for summary judgment will also be denied.

## III. ADEQUACY OF THE McLEAN PROXY UNDER § 14.

In this section, each of the plaintiffs' contentions concerning misstatements or omissions in the McLean Proxy will first be discussed factually and separately, and then as they relate to one another.

### 1. *The Favored Defendants' Agreement to Vote for the Merger.*

The proxy materials contain the categorical statement: "As part of the agreements [the March 25th purchase agreements with Reynolds] these five persons [American-Hawaiian, National Bulk, Litton, Monroe and Kroeger] have agreed to vote for the merger." McLean Letter, p. 1. The proxy materials also contain a later statement that concerns the favored defendants: "Each of the named stockholders has agreed, also subject to certain conditions, to vote its McLean shares in favor of the merger." McLean Proxy, p. 7. The actual status of the understandings that the favored defendants had with Reynolds on this score as of April 10, 1969, is, however, shrouded in an ambiguous tangle of semantics.

It is clear that the March 25th purchase agreements with Reynolds did not purport to bind the favored defendants to vote for the merger. These agreements, all substantially identical in substantive terms, indicate that the favored defendants had agreed to sell their shares for $50 per share and that Reynolds would have no obligation to buy their shares if, among other things, they did not vote their shares for the merger at the upcoming McLean stockholders meeting. Thus, on the face of the docu-

ments, the proxy statement would appear to be false on this issue.

The Court is reluctant at this stage in the proceedings, however, to hold that there was no such "agreement." It is true, as defendants contend in their briefs, that the word "agreement" can have many meanings—some much more binding than others, although this may not save the defendants at trial.

Mr. McLean stated during his deposition that prior to the March 20th Board of Directors meeting his "understanding" and "inference" was that the favored defendants' representatives [15] on the Board would vote as directors for approval of the merger and apparently further says that as shareholders all of the favored defendants had agreed or promised to vote for the merger when the question came before the McLean stockholders as long as they (the favored defendants) received $50 per share for their holdings. But Ludwig, who as principal of the National Bulk group could speak for both National Bulk and American-Hawaiian, stated at one point in his deposition: "I had never agreed to vote for the merger." He then qualified this statement saying that he had not agreed to do so prior to March 20th Board meeting, but it was never clarified whether he was then speaking about his stance as a director or as a stockholder. Shortly thereafter the following exchange occurred:

Q. What explanation were you about to give?

A. I said, I would assume that if we entered into an agreement to sell our stock it would be automatically that we would have to vote our stock.

Q. In favor of the merger?

A. In favor of the merger.

A thorough perusal of Kroeger's deposition does not clearly reveal whether or not he or American-Hawaiian (for which

---

15. Kroeger was the only "favored defendant" who actually sat on the McLean Board. He owned 5,000 shares, but as chairman of the Board of American-

Hawaiian he also might be considered a representative of the company's substantial holdings.

he apparently could speak as its Chairman of the Board) agreed to vote their shares for the merger. At one point, he states that he had no recollection of having made such an agreement; at another he thinks there may have been another agreement besides the March 25 purchase agreements in which they so agreed; at another point, he says that since he intended to vote for the merger it did not seem odd that the proxy statement said he had agreed to do so.

Casey stated categorically that Litton and Monroe (for which he was apparently authorized to speak) never made an agreement to vote their shares for the merger.

The Court is mindful of plaintiffs' contention that this state of affairs could not possibly constitute a legally binding "agreement" by the favored defendants to vote their shares in favor of the merger. After a further development of the facts it may appear that the only disputed question to be resolved here is a legal question, i. e., whether or not the use of the words "have agreed" in a proxy statement should be construed in the legal sense of agreement. If the words should be so construed under existing legal doctrine, in all likelihood the statement in the proxy materials is false. A more precise idea of the exact nature of the agreements and understandings between Reynolds, McLean and the favored defendants vis a vis the voting of the shares will also greatly assist the resolution of the further question of whether or not the misstatement is material.

The Court will, in this regard, consider the views of counsel as the case progresses on the proper parsing of the phrase "have agreed." It may appear that a reasonable stockholder would construe the phrase in its legal sense. In that case a party has either agreed or he has not; there is no middle ground. On the other hand, it is possible that such a stockholder would view the phrase as describing a situation about which there are matters of degree. In that case, the factual situation might so closely approximate the words used that the slight deviation is immaterial. In any case the matter cannot be decided on a motion for summary judgment.

### 2. Tax Consequences to the Favored Defendants.

The proxy materials state: "These purchases [of the favored defendants' shares by Reynolds] will not be tax-free transactions for the sellers, whereas it is anticipated that the exchange of stock in the merger will be tax free for other holders of McLean Common Stock." McLean Letter, p. 1. Plaintiffs did not claim that this statement is inaccurate as far as it refers to the other holders of McLean Common or to Litton, National Bulk, American-Hawaiian and Kroeger. Plaintiffs' sole claim is that the statement is false because Monroe, a pension trust fund, would not and did not pay taxes on the transaction because of its status as a pension trust fund.

Defendants concede that Monroe would not pay taxes on such a transaction, but argue (a) that this does not make the statement in the proxy materials untrue because the language is addressed to the nature of the transaction not to the nature of the taxpayer, and (b) that it is immaterial regardless because Monroe held only a small percentage of the favored defendants' shares and its tax situation would not be material to a stockholder.

Stockholders reading proxy statements should not be burdened with the necessity of turning to the Internal Revenue Code in order to understand the transaction they are asked to vote upon. Although defendants' contention that the wording of the proxy statement is an appropriate use of tax jargon is probably correct, the Court is of the view that the statement may be misleading in that it leaves the impression that all of the favored defendants would pay taxes on their transaction that the other McLean stockholders would not have to pay.

The record is now adequate to conclude that McLean well knew that the purchase of Monroe's shares would not be taxable

to Monroe. A reasonable stockholder might also have known that were he familiar with the tax treatment of pension funds because the fact that Monroe was a pension fund is disclosed in the proxy statement. The Court does not now decide whether the misstatement as to Monroe is material.

The more significant question is to determine whether McLean knew or should have known whether American-Hawaiian, National Bulk, Litton and Kroeger would have to pay taxes on the proceeds from the sale of their shares to Reynolds. For although it might be true to say that these transactions would not be tax free to the favored defendants, that disclosure may not be sufficient where the proxy materials undertake to make an affirmative statement about the unfavorable tax consequences to an inside group of stockholders receiving treatment separate from the rest of the stockholders. The obvious purpose of this statement was to influence the minority stockholders to approve the merger by: (1) setting up a distinction between the favored defendants and the other stockholders based on the adverse tax treatment that the favored defendants would suffer; and (2) providing a decreased measure with which stockholders are invited to compare the Reynolds securities they would receive under the merger agreement in order to determine whether they were getting fair treatment and whether the favored defendants were in fact being favored.

Thus, the Court concludes that in order to determine whether this statement is misleading it is necessary for the Court to have before it the information that McLean had at the time of the proxy concerning the tax situation of the favored defendants. If it appears that McLean knew or should have known that due to tax exemptions, credits or set-offs, some or all of the favored defendants other than Monroe would not pay taxes, the misleading nature of the statement that their transaction was not tax free may blossom into materiality. Since this information is not presently before

the Court, summary judgment will be denied as to this issue.

3. *The Undisclosed Veto Power.*

As part of financing agreements executed in 1964 and 1967 (and still effective in 1969) between McLean (through subsidiaries), Litton (through subsidiaries) and National Bulk (through subsidiaries), McLean was precluded from merging or selling substantially all of its assets without the consent of (effectively) Litton and Ludwig. Plaintiffs contend that the omission of any reference to this "veto power" in the McLean proxy renders it defective as a matter of law.

Defendants point out that Litton and Ludwig had already given their consent to the merger when the proxy statement was issued on April 10th through Consent Agreements dated March 25th, and, thus, no reference to the veto power was necessary or appropriate.

The Court is of the opinion that the March 25th Consent Agreements do not dispose of the matter as the defendants contend. Whether or not the veto power had been waived as of the date of the proxy, it may have been a significant factor in the transaction that resulted in the favored defendants receiving $50 for each of their shares while the other stockholders received Reynolds securities. The record does not reveal whether the waiver of the veto was an important aspect of the *quid pro quo* for which Reynolds was paying $50 per share or whether the procurement of the waiver was a pro forma matter. It is quite possible that if the waiver was a significant factor in the arrangement between the favored defendants and Reynolds, it was a matter that the stockholders were entitled to know and that should have been included in the proxy statement. A reasonable investor might well have thought it important that one reason that the favored defendants were receiving different treatment was that they had sold a valuable contractual right. This fact, a reasonable stockholder might conclude, helps explain why the favored defendants were in favor of the merger, why their

directors recommended the merger and whether the Reynolds securities are equivalent to $50 per share minus taxes.

Since there is insufficient undisputed evidence in the record as it presently stands from which the Court can evaluate the importance of the waiver in the transaction, the question also cannot be decided on a motion for summary judgment. The Court expressly reserves decision on the issue of the materiality of this omission until such time as such further evidence is in the record.

### 4. Conflict of Interest.

Plaintiffs finally contend that the proxy materials are defective because it omits "any reference to a conflict of interest on the part of Ludwig, Kroeger and Casey, whose companies * * * stood to benefit from the $50 cash payment for their shares." Plaintiffs' Brief, pp. 30–31. It is further argued, albeit in an eliptical fashion, that Mr. McLean had a conflict of interest, by reason of his having negotiated with Reynolds for both the favored defendants and the other stockholders, that should have been revealed in the proxy statement.[16] Plaintiffs' Reply Brief, pp. 14–15.

In regard to the first alleged conflict of interest, the defendants argue that no conflict existed and that if there was a conflict the facts underlying it are adequately disclosed in various parts of the proxy statement. Defendants have not responded to the plaintiffs' claim that McLean had a conflict.

Unlike the other alleged deficiencies in the McLean proxy materials, all of the relevant facts are matters of record and are undisputed. The sole question before the Court on this issue is whether various statements in the proxy statement adequately revealed to the stock-holders of McLean the nature of the relationships between the favored defendants and their representatives on the McLean Board.

The following facts are revealed in the McLean proxy statement or in the covering letter to all McLean stockholders from Mr. McLean:

1. American-Hawaiian, National Bulk, Litton, Monroe and Kroeger were receiving $50 cash per share for their substantial holdings. (McLean Letter, p. 1; Proxy, p. 8).

2. Other common stockholders would receive Reynolds securities. (McLean Letter, p. 1; Proxy, p. 6, *passim*).

3. Kroeger was a director of American-Hawaiian. (McLean Letter, p. 1; Proxy, p. 5).

4. Casey was a Senior Vice President of Litton. (Proxy, pp. 2, 4, 40, 42).

5. Ludwig was President and principal stockholder of National Bulk. (Proxy, pp. 2, 4, 40, 41, 42).

6. Kroeger, Casey and Ludwig were members of the McLean Board. (McLean Letter, p. 1 [mentions Kroeger only]; Proxy, pp. 2, 4 [Casey and Ludwig only], 5 [Kroeger only], 39, 40, 41 [Ludwig only], 42 [Casey and Ludwig only]).

7. The McLean Board unanimously approved the merger and recommended that the stockholders also approve it. (McLean Letter, pp. 1, 2; Proxy, p. 5).

Thus, it appears that the basic facts from which one knowledgeable about corporate affairs could deduce the influence and the compromised position of Ludwig, Casey and Kroeger are contained in the proxy materials. The single exception to this is the previously discussed matter of the power to veto a merger that Lit-

---

16. Indeed, the letter of Mr. McLean accompanying the proxy statement implies a very different situation: "Reynolds has negotiated agreements to purchase immediately prior to merger an aggregate of $2,300,000 * * * of McLean Common Stock from [the favored defendants]. These holders insisted that their shares be purchased for cash prior to the merger, and Reynolds agreed to do so at a price of $50 per share." McLean Letter, p. 1. Since this alleged conflict has not been adequately briefed or argued by either party, the court will not consider it on this motion.

ton and Ludwig had by reason of their financing arrangements with McLean.

The Court need not, at this point in the proceedings, rule definitively on the question of whether this fact situation amounted to a "conflict of interest" under state or federal corporate law from which further legal implications might flow. Suffice it to say that Ludwig, Kroeger and Casey had obligations that were conflicting enough that the matter should, as a matter of law, been laid before the stockholders in the proxy statement. The entire question here is the adequacy of the disclosure in the McLean proxy.

Although it can fairly be said that there was not misstatement in regard to the dual roles of the favored defendants and that all of the basic facts are revealed, the question of the adequacy of disclosure is a close one when considered in light of these factors: (1) the pertinent facts are interspersed through the proxy statement; (2) the proxy emphasizes that the McLean Board strongly and unanimously recommended that the stockholders approve the merger without similarly noting the three director defendants' compromised position; (3) the proxy fails to mention the veto power discussed previously; and (4) the potential misstatement in regard to whether the favored defendants had "agreed" to vote for the merger thus raising management's guaranteed vote in favor of the merger to 64% and discouraging extensive investigation of the facts by minority stockholders.

Although there are no disputed facts relating to this issue, the Court is of the opinion that the question of the adequacy of the disclosure of the conflicting obligations of the favored defendants' directors should not be decided on summary judgment. In its discretion, the Court determines that this issue should be preserved for evaluation in light of the further factual development necessitated by the Court's decision on the first three issues.

On this issue, plaintiffs' contention is that the McLean proxy was inadequate because it failed to characterize the compromised position of Ludwig, Kroeger and Casey as being a conflict of interest, and the defendants argue that the proxy need contain only facts and not characterizations. Neither party has cited any authority supporting these contentions. The Seventh Circuit's statement in Swanson v. American Consumer Industries, Inc., 415 F.2d 1326, 1330 (7th Cir. 1969) and Mills v. Electric Auto-Lite Co., 403 F.2d 409, 434 (7th Cir. 1968), rev'd on other grounds 396 U.S. 375, 90 S.Ct. 616 (1970) is clearly relevant:

> [T]he board was not free to state its recommendation and opinion favoring the merger without giving similar emphasis to the relationship between the directors and the other party to the bargain.

Of course, Mills involved a somewhat different situation, but the Court, as an additional discretionary ground for denying summary judgment on this issue, considers the "similar emphasis" rationale worthy of more discussion by counsel in regard to this question of whether the facts about the position of the favored defendants and their directors are adequately disclosed by the McLean Proxy.

### 5. The Relationship of the Four Alleged Misstatements or Omissions.

Each of the plaintiffs' four allegations of inadequacy of the McLean Proxy revolve around the thesis that the proxy was misleading by reason of its failure to sufficiently enlighten the stockholder as to the actual status of the favored defendants in the McLean-Reynolds merger. One aspect of this litigation is the plaintiffs' allegation that the favored defendants received a better price for their identical shares of McLean Common than did plaintiffs' class by reason of their inside position, but that is not before the Court on this motion. What is before the Court is the question of whether the proxy statement, which was instrumental in effectuating the exchange, was misleading.

As to three of the alleged deficiencies, the Court denies summary judgment on the ground that there are not sufficient undisputed facts to make summary judgment proper. As to the conflict of interest matter, the Court denies summary judgment in order to preserve the issue for proper evaluation in light of the further facts developed on the other three issues. Since this temporary avoidance of the conflict of interest issue is somewhat unusual, the Court deems it proper to state clearly its view of the relationship of the four alleged misstatements or omissions.

The first two pages of the proxy materials contain Mr. McLean's letter to the stockholders. That letter advised the stockholders that the favored defendants "have agreed" to vote for the merger and that, counting their votes, management was assured of a 64% vote in favor of the merger when only 67% was required for approval. Counsel have quibbled about whether this statement, if it is false, would mislead the stockholder into voting for the merger or not voting at all (making it more difficult for management to get 67%). Without expressing any view on this speculative question, it is obvious to the Court that one effect of the statement would be that the shareholder would be inclined not to give the proxy statement careful attention because the result of the stockholders vote, i.e., approval of the merger, would seem to be a foregone conclusion. Thus, if the statement that the favored defendants "have agreed" is later found to be false, it will affect the Court's view of all the other alleged misstatements.

The statement that the transaction would not be tax free to the favored defendants would similarly have the effect of diverting the stockholder's attention from the position of the favored defendants. If the stockholder sees on page one of the proxy materials in a letter from the president that these inside persons are willing to take $50 per share and pay taxes on it, the likely inferences are that this explains the different treatment of the favored defendants and that McLean Common is worth $50 per share minus taxes. If it turns out that McLean knew the favored defendants would pay no taxes, the stockholder is deceived. Perhaps he would have thought again about voting for the merger had he known that the special group was receiving a flat $50 though he would receive a Reynolds security of unknown market value.

If there was no basis in tax treatment for distinguishing the favored defendants from the other stockholders, the favored defendants' veto power over a merger and their conflicting obligations also assume greater importance. The withholding of the information concerning the veto altogether, if it was significant, and the dispersion of the information regarding the conflict make it more difficult for the stockholder to form his own opinion about the true basis for the different treatment afforded the favored defendants.

The Court is of the view that under § 14(a) it is proper to find a proxy statement to have violated that section if one misstatement or omission influences another, and to find the aggregate "material." After a further development of the facts, it may become apparent that although some or all of the alleged misstatements and omissions are only slightly inaccurate or misleading, the combination of these misstatements will amount to inadequate disclosure of the favored defendants' status and treatment.

■■ It is important to remember the type of statute that the Court is trying to apply in this case. It is a remedial statute and should be interpreted broadly in order to achieve the purpose for which Congress designed it. As the Supreme Court stated in J. I. Case Co. v. Borak, 377 U.S. 426, 431–432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), in holding that private parties had the right to enforce their § 14 rights in federal courts:

. The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by

means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." H.R.Rep. No. 1383, 73d Cong., 2d Sess., 13. It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which * * * [had] frustrated the free exercise of the voting rights of stockholders." *Id.* at 14. "Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S.Rep.No. 792, 73d Cong., 2d Sess., 12. These broad remedial purposes are evidenced in the language of the section * * *.

■ This Court is of the view that these "broad remedial purposes" will not be served by an interpretation of the section and Rule 14a–9 which allows a proxy to omit a fact or two here, disperse others through the proxy statement, make a slightly misleading statement there, and rest on the assumption that the drafter's task has been adequately performed if he can avoid blatant fraud and still keep the stockholder from discovering which shell the pea is under.

After a trial on the merits of plaintiffs' contentions, it may appear that there is no substance to the interrelationship between the various allegations that the Court now perceives, but, if so, that will be time enough to determine that the McLean proxy meets the difficult standards of § 14(a) and Rule 14a–9. On the present record, summary judgment for either party on the plaintiffs' contentions as an interrelated group is not proper.

## IV. DEFENDANTS' ARGUMENT REGARDING LACK OF CAUSATION.

Certain defendants argue in their brief in support of their cross-motion for summary judgment that there was no causative link between the allegedly misleading proxy materials and the effectuation of the merger by which plaintiffs claim to be damaged because there were sufficient votes in favor of the merger that were not based on the proxy statements. To achieve this result defendants argue that the 64% of the stock controlled by the management of McLean and the favored defendants should be aggregated with the 479,792 shares of McLean owned by the forty-seven stockholders whose affidavits were submitted in this action by defendants in support of the defendants' cross-motion in order to surpass the 67% needed to approve the merger.

The identical affidavits state in substance that the affiants have read the complaint in this action, that the alleged misstatements did not influence their votes and that their votes in favor of the merger were based on their own independent evaluation of the terms of the merger.

This argument is totally unmeritorious. It was exactly this type of defense that the Supreme Court intended to preclude with its decision in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384–385, 90 S.Ct. 616, 622 (1970) when Justice Harlan stated:

> There is no need to supplement this requirement, as did the Court of Appeals, with a requirement of proof of whether the defect actually had a decisive effect on the voting. Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed

to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

Defendants make a feeble attempt to bring the instant case within the reservation that the Supreme Court noted in *Mills* in footnote 7. *Id.* at 385, 90 S.Ct. at 622. But that reservation concerned only those situations where management *itself*· controlled sufficient votes to approve the transaction without soliciting votes from other stockholders. Some courts have held that even in such a situation of management control the causative relationship might well be shown. See: Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7th Cir. 1969); Laurenzano v. Einbender, 264 F.Supp. 356 (E.D.N.Y.1966); but see Laufer v. Stranahan, CCH Fed. Sec.L.Rep. ¶ 92,617 (S.D.N.Y.1970).

Quite obviously, none of these decisions apply to a case such as this where management (including the favored defendants) had insufficient shares to pass the merger without the proxies of a number of stockholders such as the affiants. Were these affidavits at all relevant on the issues of this case, plaintiffs would certainly be entitled to examine each of them to attempt to discredit his affidavit —an impractical situation that the Supreme Court expressly refused to make a part of federal securities law litigation.

■ Therefore, this Court holds, consistent with *Mills*, that the McLean proxy that is the subject of this motion "was an essential link in the accomplishment of the transaction" and that the necessary causation will be established as a matter of law if the Court determines the alleged misstatements and omissions in the proxy to be material.

For the foregoing reasons, the motions for summary judgment will be denied. Submit order in accordance herewith.