Marvyn GOULD, Executor of the Estate of J. Donald Rogasner, et al., Appellants in No. 75–1338.

v.

AMERICAN–HAWAIIAN STEAMSHIP COMPANY et al., Cross-Appellants in No. 75–1339.

Nos. 75–1338 and 75–1339.

United States Court of Appeals, Third Circuit.

Argued Oct. 3, 1975.

Decided April 8, 1976.

---

Harold E. Kohn, Philadelphia, Pa., for appellants.

Felice R. Cutler, Cutler & Cutler, Los Angeles, Cal., for Joseph T. Casey.

Charles E. Foster, Beverly Hills, Cal., for Litton Industries, Inc. and Monroe International Corporation Retirement Plan Trust.

Before MARIS, VAN DUSEN and HUNTER, Circuit Judges.

MARIS, Circuit Judge.

This is a consolidated class action for damages brought in the United States District Court for the District of Delaware. Originally, two actions were instituted, one by J. Donald Rogasner [1] (Civil Action No. 3707) and the other by I. David Pincus (Civil Action No. 3722), both of them on behalf of the plaintiffs and all others similarly situated. In the Rogasner action, Mary S. McCord and Charles T. McCord, Jr. subsequently intervened as plaintiffs. On February 27, 1970, the district court ordered that the Rogasner case be maintained as a class action. On July 20, 1970, the two actions were consolidated by the district court for all purposes. The actions were brought, and the consolidated action proceeded, against American-Hawaiian Steamship Company (herein American-Hawaiian), National Bulk Carriers, Inc. (herein National Bulk), Litton Industries, Inc. (herein Litton) and Monroe International Corporation Retirement Plan Trust (herein Monroe), McLean Industries, Inc. (herein McLean Industries) and R. J. Reynolds Tobacco Company (herein Reynolds), and Malcolm P. McLean, Clara L. McLean, Joseph T. Casey, Disque D. Deane, Edward A. Hirs, Hal A. Kroeger, Daniel K. Ludwig, James K. McLean, James T. Murff and Beverly R. Wilson, Jr., all of the individual defendants being directors of McLean Industries. The actions were based upon the alleged violation of sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78n(a) and Rules 10b–5 and 14a–9 promulgated by the Securities and Exchange Commission thereunder, respectively, 17 C.F.R. §§ 240.10b–5 and 240.14a–9, as well as alleged breaches of fiduciary duties, primarily in connection with the solicitation of proxies by McLean Industries for shareholders' approval of its merger into Reynolds, a merger which was consummated on May 13, 1969 or shortly thereafter. The district court fully discussed the facts of the case and the legal questions involved in a series of opinions filed, respectively, on November 10, 1970, 319 F.Supp. 795; September 17, 1971, 331 F.Supp. 981; June 20, 1972, 55 F.R.D. 475; December 6, 1972, 351 F.Supp. 853; August 17, 1973, 362 F.Supp. 771; June 28, 1974; and December 19, 1974, 387 F.Supp. 163. We need merely to summarize, therefore, in this opinion the facts relevant to the determination of the issues presented on appeal.

## THE FACTS

McLean Industries was a Delaware corporation which was engaged primarily in the cargo shipping business. It appears that prior to its merger into Reynolds, McLean Industries had 10,632,000 shares of common stock outstanding of which the following amounts were held by the defendants:

---

1. Rogasner subsequently died and his executor, Marvyn Gould, was substituted as plaintiff.

| | | |
|---|---|---|
| American-Hawaiian | 1,000,000 | 9.4% |
| National Bulk | 250,000 | 2.4% |
| Litton | 965,000 | 9.1% |
| Monroe | 85,000 | 0.8% |
| Hal A. Kroeger | 4,000 | |
| Malcolm P. McLean | 3,609,473 | 33.9% |
| Clara L. McLean | 150,000 | 1.4% |
| Disque D. Deane | 500 | |
| Edward A. Hirs | 113,203 | 1.1% |
| James K. McLean | 539,920 | 5.0% |
| James T. Murff | 40,550 | 0.4% |
| Beverly R. Wilson, Jr. | 6,000 | |
| | 6,763,646 | 63.5% |

Casey and Ludwig, although directors of McLean Industries, held no stock in the corporation.[2] Casey was a senior vice-president of Litton and a member of the Investment Committee of Monroe. Ludwig was the principal owner of National Bulk, which owned Berkshire Industries, Inc., which in turn owned 90% of the stock of American-Hawaiian. Kroeger was chairman of the board of directors of American-Hawaiian. Deane was a partner in Lazard Freres & Co. (herein Lazard), McLean Industries' financial advisor. Malcolm McLean was president and chief executive officer of McLean Industries. James McLean and Clara McLean were brother and sister, respectively, of Malcolm McLean.

American-Hawaiian, National Bulk, Litton and Monroe had acquired their McLean Industries stock in connection with financing arrangements into which McLean Industries had entered in 1964 with a subsidiary of Litton and in 1967 with a corporation owned jointly by Litton and National Bulk. These arrangements enabled McLean Industries to expand its operations in order to compete in the shipping industry in the light of improved methods and higher costs. The terms of the agreements, however, provided that McLean Industries could not merge with another company without the prior consent of Litton and Monroe. In 1968 Malcolm McLean determined that, in order to remain competitive, McLean Industries must undertake a further expansion program. He believed that a consolidation with Reynolds would provide the large amount of additional working capital and borrowing capacity needed. Accordingly, in January 1969, he opened discussions with representatives of Reynolds with a view to effecting such a consolidation. A tentative agreement was reached whereby Reynolds would tender to all McLean Industries shareholders for each common share held by them either $50 in cash or a $40 principal amount 20-year 7% Reynolds debenture and ⅝ths of a warrant to purchase a share of Reynolds common stock at $47.50. Ludwig, representing National Bulk, American-Hawaiian, Kroeger and himself, and Casey, representing Litton and Monroe, assured Malcolm McLean that they would not oppose the merger, but stated that they would accept only $50 per share in cash for their McLean Industries stock. In late February, Reynolds withdrew its offer because of unfavorable tax legislation then pending in Congress.

Negotiations were resumed in March between Malcolm McLean and representatives of Reynolds for a statutory merger of McLean Industries into Reynolds and a tentative agreement was reached under which Reynolds would give in exchange for each share of McLean Industries common stock, one share of a new Reynolds preferred stock with an annual dividend of $2.25, a liquidation and redemption price of $50 and a conversion privilege into one and one-half shares of common stock upon payment of $22.00.

On March 20, 1969, the board of directors of McLean Industries received from Lazard an opinion valuing the new Reynolds convertible preferred stock at $50 per share, based on the market price on that date of $42.375 per share for the Reynolds common stock. After considering the Lazard opinion and being fully informed of the understanding that Kroeger, National Bulk, American-Hawaiian, Litton and Monroe would as they had insisted receive $50 per share in cash for their McLean Industries stock, the McLean Industries board voted unanimously to approve the merger. Directors Ludwig, Kroeger and Casey were present and voting. A draft proxy state-

---

**2.** It does appear that Ludwig had some beneficial interest in 1,203,363 of the shares of McLe-an Industries common stock owned by American-Hawaiian and National Bulk.

ment soliciting the necessary approval of the shareholders was presented to and approved by the board and a meeting of the shareholders for the purpose of voting on the proposed merger was called for May 13, 1969.

On March 25, 1969, Litton and National Bulk executed written agreements giving to McLean Industries their consent to the merger, a consent which McLean Industries was required to obtain under the 1964 and 1967 financing agreements. On the same date, Litton, Monroe, National Bulk, American-Hawaiian and Kroeger signed agreements with Reynolds which obligated Reynolds to purchase their McLean Industries common stock at $50 per share, if they voted their stock in favor of the merger.

The proxy statement, 74 pages in length, was issued on April 10, 1969 and mailed to the McLean Industries shareholders on April 15th, accompanied by a two-page covering letter by Malcolm McLean. The statement and letter described the proposal for the merger, stating that the Litton and National Bulk interests were to receive $50 per share in cash and that those interests as well as the McLean family interests—all together representing 64% of the McLean Industries common stock outstanding (slightly less than the necessary two-thirds) —had agreed to vote for the merger. The statement included market prices of Reynolds and McLean Industries stock from 1964 through the first quarter of 1969 and other relevant information. Attached to the statement was the Plan and Agreement of Merger.

The market price of Reynolds common stock had declined to $40.125 by April 8, 1969. On May 12th Lazard issued an updated opinion to McLean Industries valuing, as of that date, the new Reynolds preferred stock at $45 per share, but also stating that Lazard continued to consider the terms of the merger fair. This updated Lazard report was reviewed by the board of directors of McLean Industries at a special meeting,

which Ludwig, Kroeger and Casey did not attend, on May 13th immediately prior to the shareholders' meeting. The seven directors present voted to reaffirm their approval of the merger. At the meeting which followed, the merger was approved by the shareholders by the following vote:

| | Common | First Preferred | Cumulative Preferred |
|---|---|---|---|
| Voting in favor of merger | 8,332,239 | 90,877 | 3,130 |
| Voting against merger | 185,230 | 3,712 | 94 |
| Not voting | 2,114,531³ | 52,336 | 1,341 |

The stock held by Litton, Monroe, National Bulk, American-Hawaiian and Kroeger was voted in favor of the merger. Thereafter the merger was consummated. The shareholders who demanded appraisal of their shares later accepted $45 per share for their holdings. On May 15, 1969, following commencement of trading on the New York Stock Exchange, the market price of the new Reynolds preferred stock was $41.75 per share.

The Rogasner suit was filed on May 6, 1969. It sought an injunction against the merger, and damages. Later, after the merger had been approved, the complaint in the Rogasner suit was amended to request that the merger be set aside. Still later the plaintiffs in the consolidated action withdrew their prayer to set aside the merger and limited to damages the relief sought.

While, as we have seen, the complaint alleged violations of sections 10(b) and 14(a) of the Securities Exchange Act of 1934, (herein the Act), 15 U.S.C.A. §§ 78j(b) and 78n(a), and Rules 10b–5 and 14a–9 of the Regulations promulgated by the Securities and Exchange Commission under the Act, (herein the Regulations), 17 C.F.R. §§ 240.-10b–5 and 240.14a–9, as well as breaches of fiduciary duties, the judgment now before us on appeal involves an adjudication of the plaintiffs' claim for damages under section 14(a) of the Act[4] and Rule 14a–9 of the

---

**3.** The holders of 223,136 shares of common stock demanded appraisal of their shares.

**4.** Section 14(a) of the Act is as follows:
"Proxies

(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of

Regulations only,[5] which the district court regarded as the broadest of the claims. The court held that the plaintiffs had not sufficiently established their claims based on breach of fiduciary duties under federal law. The plaintiffs had claimed that Casey had a federal fiduciary duty to obtain for the plaintiffs the same cash payments in the merger as some of the defendants had received. The court pointed out, however, that while federal fiduciary obligations were created by the Act, these were only in the area regulated by the Act and that the claim to equal treatment was not in that area. 362 F.Supp. at 775. The plaintiffs do not question that ruling here. The court agreed that section 14(a) of the Act imposed on Casey a federal fiduciary duty not to approve a materially false or misleading proxy statement. The court correctly held, however, that since this claim was merely duplicative of the plaintiffs' contention that Casey had directly violated section 14(a) by approving such a defective statement, it need not be separately considered. We accordingly restrict our consideration to the plaintiffs' claim for damages under section 14(a) of the Act and Rule 14a–9(a) of the Regulations based upon the defective proxy materials circulated to them.

The plaintiffs' first motion for summary judgment was denied. Following the later submission of certain of the defendants' answers to interrogatories, the district court granted the plaintiffs' renewed motion for summary judgment against Reynolds, as successor to McLean Industries, for being the issuer of a materially defective proxy statement, and against Malcolm McLean, Casey, Ludwig and Kroeger for knowingly approving as directors a false proxy statement, all of whom having thus violated section 14(a) of the Act and Rule 14a–9(a) of the Regulations were held liable for the damages suffered by the plaintiffs as a result of the violations. The court denied summary judgment against the six "non-involved" directors who, the court found, were not shown to have been aware of the falsity of the statement. The court also denied summary judgment against the corporate defendants other than Reynolds, holding that there remained unresolved questions of agency and authority upon which their responsibility under section 14(a) of the Act was necessarily predicated. 331 F.Supp. 981 (1971).

Defendants Casey, Kroeger and Ludwig moved to vacate and reopen the summary judgment of liability as to them. In an opinion filed December 6, 1972, 351 F.Supp. 853, the district court stated that negligence is the appropriate standard of culpability to establish an individual's liability for damages for a violation of section 14(a) of the Act, and Rule 14a–9(a) of the Regulations, which standard, the court decided, was applicable to the four defendants summarily found liable as well as to the remaining defendants whose liability had not then been determined. Thereafter on April 30, 1973, the district court approved a settlement of all the claims of the plaintiffs against all the defendants except Litton, Monroe and Casey. The amount paid in settlement was $4,000,000. By agreement of the parties the case proceeded to trial by the court without a jury as to the defend-

any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title." 15 U.S.C.A. § 78n(a).

5. Rule 14a–9(a) of the Regulations is as follows:

"False or misleading statements.

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a–9(a).

ants, Litton, Monroe and Casey, who are the cross-appellants here. Litton and Monroe were held liable for violations of section 14(a) of the Act and Rule 14a–9(a) of the Regulations, through the acts of Casey, who was held to be their agent in matters relevant to the merger. Casey had already been held liable individually by summary judgment, as we have seen. The court concluded

(1) that the proxy statement failed accurately to apprise the McLean Industries shareholders of material facts pertaining to the disparate treatment afforded various of the shareholders under the terms of the merger;

(2) that full and accurate disclosure might have resulted in the plaintiffs sharing in the so-called premium received by the "favored defendants" [6] and

(3) that the defendants should bear the risk of the uncertainty as to whether or not the plaintiffs would have obtained a greater consideration for their McLean Industries stock had they had the benefit of a fully accurate proxy statement.

The court "under considerations of equity" accordingly held the three defendants liable for damages and assessed the damages at $2,431,083.53.[7] A final judgment was entered for this amount in favor of the plaintiffs' class and against the three defendants Litton, Monroe and Casey. It was from this final judgment that the appeals now before us were taken.

## THE CONTENTIONS OF THE PARTIES

On the defendants' appeal, Casey, Litton and Monroe urge that the district court erred in determining that the proxy statement contained misstatements and omissions which were material to explain why certain McLean Industries shareholders received cash while others received Reynolds securities in the merger. Litton and Monroe also contend that the court erred by applying principles of agency in holding them liable for the dissemination of the statement. Defendant Casey urges on appeal that the court erred in finding him liable on a motion for summary judgment and in applying negligence as the standard for the liability under section 14(a) of the Act and Rule 14a-9(a) of the Regulations of a nonmanagement director. All three defendants urge that the court erred in finding that the plaintiffs had sustained actual damages, and, in any event, in the method by which it determined the amount of those damages and the shareholders to which they were awarded. The plaintiffs on their appeal assert that the district court erred in its refusal to find that the proxy statement contained additional material misrepresentations, in its determination of the amount of damages sustained by the plaintiffs and in its refusal to award prejudgment interest.

## THE DEFICIENCIES IN THE PROXY MATERIALS

Basic to the adjudication of the defendants' liability in this case was the determination of the district court that the proxy statement submitted to the McLean Industries shareholders prior to the vote on the merger was materially deficient in violation of section 14(a) of the Act and Rule 14a-9(a) of the Regulations. The court on motion for summary judgment found that the statement falsely stated that Litton, Monroe, National Bulk, American-Hawaiian and Kroeger had agreed to vote for the merger, that the statement failed to disclose that Litton and National Bulk had a veto power

**6.** The district court employed this term without derogatory intent, as do we, to refer to the five defendants, Litton, Monroe, National Bulk, American-Hawaiian and Kroeger, who were offered a consideration for their McLean holdings different from that offered the other shareholders. However, these five defendants were undoubtedly favored by having a choice of consideration at least prior to their agreements with Reynolds of March 25, 1969.

**7.** This figure was based on the distribution to the plaintiffs of their proportionate share of the premium of $8.25 per share which the court found defendants Litton and Monroe had received. In computing the amount, the court included the shareholders who had been paid $45 on the appraisal of their shares and gave no credit for the $4,000,000 received by the plaintiffs in settlement from the other defendants.

over the merger and that the statement inadequately disclosed the conflicting interests of directors Casey, Ludwig and Kroeger and the dual role of Malcolm McLean in negotiating with Reynolds for both the favored shareholders and the other shareholders. The court held that in each instance a full and accurate disclosure to the shareholders was material to their determination as to their votes on the merger. While not, except in one respect,[8] contesting the underlying facts upon which this holding was based, as found by the court, the defendant-appellants strongly urge that the court's determination of materiality was erroneous and that, in any event, it was error to make such a determination by summary judgment before trial.

In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593, 602 (1970), the Supreme Court said:

"Where the misstatement or omission in a proxy statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)."

On its face the first sentence of this statement would appear to lay down a broad standard for determining materiality, the mere possibility that a false or misleading statement might be considered by a reasonable shareholder as important to his voting decision. It seems clear, however, as Judge Friendly convincingly pointed out in *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1301–1302 (2d Cir.1973), that this statement was not intended to establish a definition of materiality, that not being the issue before the court. Moreover, the court cited with apparent approval two opinions of the Court of Appeals for the Second Circuit, *List v. Fashion Park, Inc.,* 340 F.2d 457, 462, *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 162 (1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 637, 21 L.Ed.2d 570 (1969), which set a somewhat narrower standard for determining materiality. In the *Gerstle* case, Judge Friendly said (p. 1302):

"We think that, in a context such as this, the 'might have been' standard mentioned by Mr. Justice Harlan sets somewhat too low a threshold; the very fact that negligence suffices to invoke liability argues for a realistic standard of materiality. Justice Harlan's next sentence in *Mills,* that the defect must 'have a significant *propensity* to affect the voting process,' 396 U.S. at 384, 90 S.Ct. at 621, [24 L.Ed.2d at 602] (emphasis in original), comes closer to the right flavor. While the difference between 'might' and 'would' may seem gossamer, the former is too suggestive of mere possibility, however unlikely. When account is taken of the heavy damages that may be imposed, a standard tending toward probability rather than toward mere possibility is more appropriate."

The view thus taken by the Court of Appeals for the Second Circuit has been approved and followed in the Fifth Circuit, *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 603–604, *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) and we are constrained to follow it in this case.[9] *See Rochez Brothers, Inc. v. Rhoades,* 491 F.2d

---

8. The defendant-appellants do contest the finding that the five shareholders mentioned had not agreed to vote for the merger. We are satisfied, however, that the documents and testimony in the record compelled the court's finding in this regard and we find no error in it.

9. For the contrary view that materiality exists

402, 408 (3d Cir.1974). We, accordingly, hold that the basic test of materiality in a section 14(a) setting is whether it is probable that a reasonable shareholder would attach importance to the fact falsified, misstated or omitted in determining how to cast his vote on the question involved. Or, as Judge Friendly put it in the *General Time* case, p. 162, whether "taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course."

■ The issue of materiality, resting as it does upon what is believed would be the reaction of a "reasonable shareholder", is a mixed question of law and fact and the subsidiary fact issues cannot ordinarily be decided by summary judgment. But if the facts falsified, misrepresented or withheld are so obviously important to the shareholder's decision that reasonable minds cannot differ on the question of materiality and the underlying facts and the inferences to be drawn from those facts are free from controversy, the question becomes one of law which may appropriately be decided by summary judgment. *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir.1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). Here the district court decided four of the six issues of materiality by summary judgment upholding materiality in all four instances. One of the remaining issues was decided after trial not to be a material defect and the other appears not to have been pressed at trial and was not decided by the court. We turn then to consider the action of the court on these issues in the light of the applicable rules as we have stated them.

At the outset it should be noted that the fact which was doubtless of the greatest interest to the shareholders in considering the merger was fully disclosed in both the proxy statement and Malcolm McLean's covering letter. This was that Litton, Monroe, National Bulk, American-Hawaiian and Kroeger were to receive $50 per share in cash for their holdings whereas all other shareholders were to receive Reynolds preferred stock. All of the facts alleged by the plaintiffs to have been falsified, understated or omitted from the proxy materials could be regarded as material only to the extent, if at all, that they tended to furnish the shareholders with information which would throw light upon whether it was in their interest to approve or disapprove a merger which involved this disparity in the treatment of the two classes of shareholders.

(a) *The alleged agreement to vote for the merger*

The first fact alleged by the plaintiffs to have been false was the statement which appeared both in the proxy statement and the covering letter that the five favored shareholders had agreed to vote for the merger. The district court held, on consideration of the answers to interrogatories and depositions before it on the second motion for summary judgment, that this statement was false or, even if assumed to be technically accurate, misleading. It appears that by the agreements Reynolds bound itself to purchase the McLean Industries stock of the five favored shareholders for $50 per share in cash if the latter voted their stock in favor of the merger. The written agreements did not expressly obligate them so to vote. However, Casey, who was negotiating for Litton and Monroe, through Malcolm McLean, testified by deposition that McLean and Reynolds could have assumed that they would do so.

■ We are satisfied that the district court did not err in holding on summary judgment that the statements that the five

---

if a reasonable shareholder might consider the misstatement or omission important to his voting decision see *Northway Inc. v. TSC Industries, Inc.*, 512 F.2d 324, 329–332 (7th Cir.1975),

*cert. granted*, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975), rev'd, (1976). —— U.S. ——, 96 S.Ct. 2126, 48 L.Ed.2d 757.

shareholders had agreed to vote for the merger were false or, at the least, misleading. The defendant-appellees urge that the statements did not imply a legal obligation to vote but merely an understanding in a broad colloquial sense that they intended to do so. We cannot agree that the record would support such a finding. For in the light of their context in the statements it is clear that the words "have agreed" were intended to have their normal meaning of having assumed a legally binding obligation. And even if they were intended by the draftsmen to import only a nonbinding understanding or intention, the statements would thereby have been rendered so ambiguous as to be almost as misleading to the shareholders as if they had been totally false. The question remains as to whether the statements were properly held on summary judgment to be material.

The district court concluded that the statements with respect to the five favored shareholders having agreed to vote for the merger were material and we agree. To tell the body of shareholders that a group of five shareholders had agreed to vote for the merger whose votes when added to those of the McLean interests who were promoting the merger would constitute very close to the required two-thirds majority, was to indicate that opposition was almost certainly doomed to defeat and such a statement would surely discourage careful consideration of the merits of the plan of merger and even voting on it at all. Moreover, since it could be considered as one of the reasons why the five shareholders were being given special treatment it would tend to mislead a shareholder in his consideration of the need for such special treatment and its fairness.

It is suggested that the evidence before the district court indicated that the urgency of the need of McLean Industries for additional capital and borrowing capacity in order to maintain its competitive position in the shipping industry was so great and the need for the merger was accordingly so imperative that no reasonable shareholder could have believed that the favored shareholders would not vote for it even if they were not bound by agreement to do so. Therefore, runs the argument, the court erred in deciding on summary judgment that the false statement in the proxy materials that the favored shareholders had agreed to vote for the merger, was a material misstatement in violation of section 14(a) of the Act and Rule 14a-9(a) of the Regulations.

We find this contention unpersuasive. While there was evidence of need for additional capital for expansion of the business the district court made no such finding either on summary judgment or after trial. It is most significant, moreover, that the proxy statement and covering letter did not stress McLean Industries' need in this regard in any forceful way. The shareholders were not told that the merger was critical to the future success of the business and the preservation of their investment. And, finally, the argument misses the whole thrust of this case. The plaintiffs do not contend that the deficiencies in the proxy materials influenced them with respect to their voting for or against the merger, but rather that, even though they might have favored the merger, they were misled as to the potential effectiveness of their voting power for bargaining purposes and thereby were deprived of the opportunity to use the possibility of their voting in the negative as a negotiating lever in seeking a modification of the merger agreement which would be more favorable to themselves. In this regard the false statement that the five favored shareholders had agreed to vote for the merger was highly material since if true it indicated that very nearly two-thirds of the shares were committed to the merger. From this fact the plaintiffs could fairly assume that they had practically no potential power to block the merger by their votes. In this context we do not regard *Laurenzano v. Einbender,* 448 F.2d 1 (2d Cir.1971) cited in support of the argument as apposite. Moreover, that case and others like it are clearly distinguishable on their facts.

The false statements were so obviously important to the shareholders' decision that we think reasonable minds could not differ as to their materiality. The district court accordingly did not err in so holding by summary judgment.

### (b) *The omission of reference to the veto power*

■ We turn to the next matter relied on by the plaintiffs, the omission from the proxy materials of any reference to the veto power which was held by Litton and National Bulk over merger plans of McLean Industries. As we have seen, agreements to which McLean Industries had subscribed in 1964 and 1967 provided that McLean Industries could not enter into any merger or consolidation with another corporation without the prior written consent of Litton and National Bulk. On March 25, 1969, prior to the issuance of the proxy statement, such written consents were given, clearing the way for the merger. However, the fact that Litton and National Bulk had a veto power over the merger prior to March 25, 1969 was not disclosed in the proxy materials and this, the court found on summary judgment, was a material omission which violated section 14(a) of the Act and Rule 14a–9(a) of the Regulations. In so holding by summary judgment, we think the district court erred. When the proxy material was issued the veto power of Litton and National Bulk over this particular merger no longer existed, having been given up by the consents executed on March 25, 1969. It was, therefore, then of historical interest only. Nonetheless, the fact that it had been given up by these two shareholders might have been considered as an additional reason in support of the fairness of the special treatment accorded them and their affiliates in the merger. It may well be that a reasonable shareholder might have regarded knowledge of it as material to his consideration of the fairness of the merger. But, if anything, it would merely have provided an additional reason to consider the treatment of the favored shareholders fair and as such we cannot say that

it was so obviously important that reasonable minds could not differ on the question of its materiality. It was, therefore, not an issue which could be determined by summary judgment.

### (c) *The conflict of interest of Casey, Ludwig and Kroeger*

■ The plaintiffs assert and the district court found on summary judgment that the proxy statement failed adequately to disclose the conflicting interests of three of the McLean Industries directors, Casey, Ludwig and Kroeger. The facts which were disclosed at various places in the proxy statement and covering letter are that American-Hawaiian, National Bulk, Litton, Monroe and Kroeger were receiving $50 in cash per share for their McLean Industries stock, while the other common shareholders were receiving Reynolds preferred stock, that Kroeger was a director of American-Hawaiian and himself a shareholder who would receive cash rather than stock, that Ludwig was president and principal shareholder of National Bulk, that Casey was a senior vice-president of Litton and all three were directors of McLean Industries, and that the McLean Industries board of directors unanimously approved the merger and recommended that the shareholders also approve it. It is quite clear that if a reasonable shareholder had all these facts in mind he would have had to conclude that Kroeger, Ludwig and Casey had, as directors of McLean Industries, interests which conflicted with those of the shareholders of that corporation other than Litton, Monroe, National Bulk, American-Hawaiian and Kroeger. This fact of conflicting interests on their part was obviously of material interest to the other shareholders in considering their votes on the merger and it was nowhere expressly stated in the proxy statement or letter. The court held on summary judgment that the facts giving rise to the conflicting interests were so buried in the documents as not to constitute an adequate disclosure to the shareholders and that failure adequately to dis-

close the conflicts constituted a material defect in the proxy statements.[10]

The defendant-appellants argue, on the other hand, that the facts which were stated in various parts of the documents did constitute an adequate disclosure of the conflicting interests of the three directors in question. While we find ourselves in general accord with Judge Mansfield's statement in *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y.1967), that "corporations are not required to address their stockholders as if they were children in kindergarten", we also bear in mind Judge Friendly's admonition in *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973), who, after quoting Judge Mansfield's statement, said that "it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts". In the present case many of the statements upon which the defendant-appellants rely are scattered through and rather buried in the lengthy proxy statement. There is nowhere a statement giving emphasis to the conflicts of interest similar to that given to the board's approval of the merger agreement.[11] We conclude that the district court did not err in holding on summary judgment that the proxy materials were materially deficient in this respect.

(d) *Malcolm McLean's negotiating position*

██ The district court also held on summary judgment that the proxy materials were materially deficient in failing to disclose that Malcolm McLean negotiated the merger agreement for both the favored defendants and the remaining shareholders. The undisputed facts indicated that Malcolm McLean was the sole negotiator with Reynolds. He did indeed speak for both the favored shareholders and those who were to receive Reynolds securities only. In the case of the favored shareholders, however, the negotiations appear to have consisted of little more than transmitting to Reynolds their nonnegotiable demand to be paid $50 per share in cash for their stock, to which demand Reynolds acceded. Negotiations in the normal sense of the word appear to have been carried on by Malcolm McLean only on behalf of the other shareholders, of whom he was one, to whom Reynolds agreed to give securities in exchange for their stock, an exchange in which he himself participated along with the others. We are compelled to conclude that the fact that Malcolm McLean actually negotiated with Reynolds for conflicting interests in the formulation of the merger agreement is not so clear as to have been appropriate for determination on summary judgment and that the district court erred in making such a determination.

(e) *The value of the Reynolds preferred stock*

The plaintiffs argue that the proxy statement and letter were defective in that they would cause a shareholder to believe that the Reynolds convertible preferred stock which he was to receive was worth $50 per share and was thus the exact equivalent of the $50 in cash which the favored shareholders were to receive for their shares. They emphasize the statement in the proxy statement and letter that Lazard had advised the corporation that, in their opinion, the terms of the merger were fair and equitable to each class of shareholders, and they urge that the proxy statement failed to disclose the data upon which the Lazard conclusion was based.

The Lazard opinion referred to in the proxy statement was issued March 20, 1969. After stating in very general terms the factors taken into consideration, including the market value of the Reynolds common stock on that date, it expressed the opinion

---

10. *See Mills v. Electric Auto-Lite Co.*, 403 F.2d 429, 435 (7th Cir.1968), *vacated on other grounds and remanded*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Beatty v. Bright*, 318 F.Supp. 169, 174–175 (S.D.Iowa 1970).

11. *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326, 1330 (7th Cir.1969); *Mills v. Electric Auto-Lite Co.*, 403 F.2d 429, 433 (7th Cir.1968); *vacated on other grounds and remanded*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Beatty v. Bright*, 318 F.Supp. 169, 174 (S.D.Iowa 1970).

that the terms of the proposed merger were fair and equitable to the McLean Industries shareholders and that the merger was in the best interest of McLean Industries. The market value of the Reynolds stock having declined, Lazard on May 12, 1969, the date before the election, issued a supplemental opinion, which, of course, was not mentioned in the previously issued proxy statement, to the effect that in their opinion, the exchange by McLean Industries shareholders of their shares for the Reynolds preferred stock would still be fair and equitable to the shareholders. The district court did not, nor do we, regard as a material omission the failure of the proxy statement to disclose the fact that the market value of the Reynolds common stock was considered by Lazard in reaching its conclusion. The market value was only one of many factors considered and it was a fact to which every plaintiff had ready access in the market reports. Moreover, that it was not a controlling factor in the Lazard evaluation is apparent from the conclusion reached in the supplemental opinion.

▮ Contrary to the contention of the plaintiffs, the proxy statement made no reference to any estimated or probable value for the Reynolds securities. Pointing out that valuation predictions are generally not permitted and are frequently considered to be themselves examples of misleading statements [12] the district court held that inclusion of an admonition that shares of stock as yet unissued might not be worth $50 would not be necessary and could not have been material to a reasonable shareholder. 362 F.Supp. 771, 776 (1973). With this conclusion we agree.

(f) *The tax-free aspect of the merger*

▮ The issue which the court postponed until the trial on the merits was whether it was materially false for the proxy materials to state, as they did, that the purchase of McLean Industries shares by Reynolds from the favored shareholders would not be tax-free transactions, whereas it was anticipated that the exchange of stock in the merger would be tax-free for other McLean Industries shareholders. It was conceded that Monroe as a pension fund would not be subject to tax. The district court concluded, however, that it could not on summary judgment hold this statement material, even though technically a misstatement as to Monroe since Monroe held a comparatively small number of shares and a reasonable shareholder might well have known that a pension fund was not taxable. For this reason and because information as to the tax situation of the other shareholders was not before it, the district court, we think rightly, declined to adjudicate this issue on summary judgment and it apparently was not pressed at trial.

## LIABILITY OF DEFENDANTS

The determination by the district court on summary judgment, which we have upheld, that the proxy statement and covering letter were materially deficient in two respects, is sufficient to support its conclusion that those documents were "false or misleading with respect to any material fact" within the meaning of Rule 14a-9(a) of the Regulations and, therefore, in violation of section 14(a) of the Act, regardless of whether the alleged deficiencies in the proxy statement in the three other respects which we have held to be subject to factfinding were also material deficiencies which violated the statute. However, since the case must, in any event, be remanded for further proceedings in the district court for reasons stated later in this opinion, the plaintiffs, if so advised, will be free to pursue to final adjudication the alleged defects which we have held were not ripe for summary judgment. On the issue of liability, the question remains, however, as to whether the district court erred in holding defendants Casey, Litton and Monroe responsible in damages under section 14(a) for

---

**12.** *See Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.); *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *In re Brown Company Securities Litigation,* 355 F.Supp. 574, 584 (S.D.N.Y.1973); *Union Pacific R.R. v. Chicago & North Western Ry.,* 226 F.Supp. 400, 408–409 (N.D.Ill.1964); 17 C.F.R. § 240.14a-9, note (a).

the use of the materially deficient proxy statement and letter in soliciting proxies from the McLean Industries shareholders. To this question we now turn. We consider first the liability of defendant Casey.

### (a) Casey

■ Casey, as we have seen, was one of the directors of McLean Industries. He was a senior vice-president of Litton and a member of the Investment Committee of Monroe and he sat on the McLean Industries board representing their interests as shareholders. This does not mean, of course, that he was not responsible as a director to act in the interests of all the shareholders. On the contrary, he was responsible with his fellow directors for the actions of the board in which he participated as well as for his own acts or failures to act.[13] At the board meeting at which he voted to approve the merger Casey saw and approved a draft of the proxy statement subsequently issued. He knew that the statement therein that Litton and Monroe had agreed to vote for the merger was false. In fact he specifically testified in a deposition filed January 13, 1970 that neither he, Litton nor Monroe had ever made such an agreement. Of course, he knew of his own conflict of interest. He denied that he saw the proxy statement in its final form or Malcolm McLean's covering letter, but it does not appear that he made any effort to see that the deficiencies in the draft which he did see or, at least, which he approved, were corrected. The court held that in any event he would have known that the proxy statement in its final form was false if he had read it, which it was his duty to do as a member of the board of directors which was issuing the document to solicit the shareholders' proxies. The court concluded that under these circumstances Casey was liable for the materially false and misleading proxy statement, as also were Kroeger and Ludwig. The court's conclusion was based upon its application of the law of negligence as the standard for

determining liability under section 14(a) of the Act.

Defendant Casey urges that the district court erred in determining his liability on summary judgment, in any event in doing so on the second motion for summary judgment after having declined to do so on the first motion, and in not explicating the basis for the determination of liability until more than a year after that determination had been made. He further urges that the court erred in applying the law of negligence to the determination of liability rather than the narrower standard of scienter. The latter, he argues, should have been applied, at least in the case of an outside nonmanagement director such as himself.

■ We see no error in the court's action in determining Casey's liability on summary judgment since all the facts upon which it was based appeared from the documents, answers to interrogatories and depositions before the court and were undisputed. Under the circumstances, the liability of Casey under those facts became, as the court said, a matter of law. Nor was Casey prejudiced by the court's having determined his liability on the second motion for summary judgment after having declined to determine it on the first. For between the first and second motions answers to interrogatories had come in which resolved to the court's satisfaction disputed issues which had prevented the earlier determination.

■ Nor did the court err in not explicating its reasons for holding Casey to be liable until some time after it had made that decision. The court's explication followed and directly resulted from objections which Casey and other defendants raised in a motion to modify the earlier decision, namely, that in arriving at that decision the court had applied an incorrect standard. The court held in its later opinion that the law of negligence provided the standard for determining liability under section 14(a).

---

**13.** *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 364 (2d Cir.), *cert. denied, Bangor Punta Corp. v. Chris-Craft Industries,* *Inc.,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503 (Sup.Ct. 1939).

Casey does not suggest that this standard was not applied by the court in its first decision holding him liable and we think it clear that the court did then apply it. In its earlier decision is said that Casey, Kroeger and Ludwig had issued a proxy statement which misrepresented facts concerning which they had firsthand knowledge and that this made them liable. In the later opinion which fully discussed the applicable standard of liability and stated that it was negligence rather than scienter, the court reiterated the same factual basis for Casey's liability, at least as to the two material defects which we have held the court rightly found to exist. We are unable to discover that Casey suffered any genuine disadvantage from the procedure followed.

Defendant Casey strongly argues that the proper standard of liability to be applied to an outside nonmanagement director, such as he was, is a lack of good faith or, at least, scienter rather than negligence. As we have seen, the district court held negligence to be the appropriate standard under section 14(a) and we agree. The defendant urged in the district court that section 10(b) of the Act, 15 U.S.C.A. § 78j(b), provides an analogy and that under that section the courts have held that scienter must be shown. That section and Rule 10b–5 of the Regulations, 17 C.F.R. § 240.10b–5, which implements it make unlawful manipulative and deceptive devices or practices in connection with the purchase and sale of securities. It would seem clearly more appropriate to apply the standard of actual knowledge in determining liability for such fraudulent practices many of which might well appear innocent on their face.[14]

We agree with the district court that section 14(a) and Rule 14a–9(a) may be more closely analogized to section 11 of the Securities Act of 1933, as amended by the Act of 1934, 15 U.S.C.A. § 77k, which deals with civil liability for false registration statements. Each section (section 14(a) as implemented by Rule 14a–9(a) and section 11) proscribes a type of disclosure or lack of it, i. e., false or misleading statements or omissions of material facts, and each enumerates specific classes of individuals who bear liability for failure to meet the required standard of disclosure. Moreover, each involves single specific documents which are of primary importance in two fundamental areas of securities regulation, sales of securities and the exercise of the shareholders' voting power. Since section 11 of the Securities Act clearly establishes negligence as the test for determining liability, the parallel between the two sections would strongly support adoption of negligence as the standard under section 14(a).

All of the courts which have discussed the question, so far as the reported decisions indicate, have favored applying the rule of negligence as the criterion for determining liability under section 14(a). *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300–1301 (2d Cir. 1973); *Berman v. Thomson*, 403 F.Supp. 695, 699 (N.D.Ill.1975); *Norte & Co. v. Huffines*, 304 F.Supp. 1096, 1109–1110 (S.D.N.Y.1968), *aff'd in pertinent part*, 416 F.2d 1189 (2d Cir. 1969), *cert. denied*, *Muscat v. Norte & Co.*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); *Richland v. Crandall*, 262 F.Supp. 538, 553 (S.D.N.Y. 1967). The language of section 14(a) and Rule 14a–9(a) contains no suggestion of a scienter requirement, merely establishing a quality standard for proxy material. The importance of the proxy provisions to informed voting by shareholders has been stressed by the Supreme Court,[15] which has emphasized the broad remedial purpose of the section, implying the need to impose a

---

14. *See Ernst & Ernst v. Hochfelder*, —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), in which the Supreme Court held that in an action for damages brought under section 10(b), scienter in the sense of an intent to deceive was the appropriate standard of liability; *see also* Judge Adams, concurring in *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 280, 290 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

15. *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423, 427–28 (1964); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381–383, 90 S.Ct. 616, 620, 621, 24 L.Ed.2d 593, 600, 601 (1970).

high standard of care on the individuals involved. And, unlike sections 10(b) and 18 of the Act, which encompass activity in numerous and diverse areas of securities markets and corporate management, section 14(a) is specially limited to materials used in soliciting proxies. Given all of these factors the imposition of a standard of due diligence as opposed to actual knowledge or gross negligence is quite appropriate. We are confirmed in this view by the very recent case of *Ernst & Ernst v. Hochfelder,* —— U.S. ——, fn. 28, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), in which the Supreme Court pointed out that the "operative language and purpose" of each particular section of the Acts of 1933 and 1934 are important considerations in determining the standard of liability for violations of the section in question. We, therefore, conclude that the district court did not err in applying the standard of due diligence to determine Casey's liability in this case.

██ Casey points out that he received no part of the premium received by the favored defendants in the merger and he contends that it was error to hold him liable to the plaintiffs for their share of the premium which Litton and Monroe received. This is, however, not an action for an accounting for premium received but rather a suit to recover the damages suffered by the plaintiffs as the result of the defendants' wrongful acts. The fact that the plaintiffs' damages may be measured by a proportion of the premium received by the favored defendants does not make the judgment recovered any the less an award to compensate the plaintiffs for the loss which they suffered from the wrongful conduct of Casey and any other defendants who may be found liable. Casey and the other McLean Industries directors owed a duty to the plaintiffs under section 14(a) of the Act fully and fairly to disclose the material

facts in the proxy materials they issued to them. This duty they negligently failed to perform. Where two or more persons fail to perform a common duty each is liable for the entire harm resulting from the breach. *Restatement of Torts* § 878 (1939). As joint tortfeasors they are jointly and severally liable for the plaintiffs' entire damage which they have inflicted. *Bigelow v. Old Dominion Copper Mining & Smelting Co.,* 225 U.S. 111, 132, 32 S.Ct. 641, 644, 56 L.Ed. 1009, 1023 (1912); Prosser, *Law of Torts,* 314–315 (4th ed. 1971), and this is true even though one of the tortfeasors held liable has received no benefit from his wrongdoing. *Myzel v. Fields,* 386 F.2d 718, 750 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). It follows that Casey is liable in damages, both severally and jointly with any other defendants held liable, for the loss suffered by the plaintiffs.

### (b) *Litton and Monroe*

██ The district court entered judgment against Litton and Monroe based on its determination that they were absolutely liable as principals for the acts of Casey whom the court held to be their agent on the McLean Industries board of directors for purposes of the merger of McLean Industries into Reynolds and the approval and dissemination of the proxy statement to the McLean Industries shareholders. On appeal Litton and Monroe argue that the court's conclusion that Casey in his capacity as director of McLean Industries was their agent is without support in the evidence. They urge that even if Casey may be considered to be their agent, the district court erred in denying them the opportunity to establish the good faith defense permitted them under section 20(a) of the Act,[16] 15 U.S.C.A. § 78t(a). This court has recently held that ordinary agency principles are not

---

**16.** Section 20(a) provides:
"Liabilities of controlling persons
(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as

such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.A. § 78t(a).

applicable in determining secondary liability in securities violation cases. *Rochez Brothers, Inc. v. Rhoades (Rochez II)*, 527 F.2d 880, 886 (1975).[17] The court observed that Congress in enacting section 20(a) intended to limit secondary liability to those persons culpably participating in the wrongdoing creating the liability. The liability of Litton and Monroe for the acts of Casey accordingly cannot be upheld on the agency theory utilized by the district court.

The plaintiffs alternatively contend that Litton and Monroe are liable for Casey's section 14(a) violation as "controlling persons" under section 20(a) of the Act or as his aiders and abettors. Congress has not defined "control" as it is used in section 20(a). The Securities and Exchange Commission has defined it broadly as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person . . ." 17 C.F.R. § 240.12b–2(f). The courts have gone so far as to define "control" as "influence short of actual direction." *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); quoted with approval in *Richardson v. MacArthur*, 451 F.2d 35, 41–42 (10th Cir. 1971).

Litton and Monroe, it must be concluded, were "controlling persons" as to Casey under the liberal construction which is given to the controlling persons requirement of section 20(a) by the courts and the Securities and Exchange Commission and in the light of the district court's conclusion that Casey was the agent of Litton and Monroe for purposes of the McLean Industries merger and the proxy solicitation dissemination. Casey was the Litton executive charged with monitoring the Litton relationship with McLean Industries. He took over this responsibility after John B. Cogan left Litton and resigned as a McLean Industries director in October of 1967. In 1968 Casey became a McLean Industries director

with the consent of his superior at Litton. These facts, among others, bear out the district court's conclusion that Casey represented the interests of Litton and Monroe on the McLean Industries board and would support a finding that Litton and Monroe possessed the power to control Casey sufficiently to stamp them as "controlling persons" under the Act.

Casey's negligence cannot be imputed to Litton and Monroe by reason solely of their relationship to him, however. *See Rochez II, supra*, p. 885. Moreover, even though they were persons controlling Casey, within the meaning of section 20(a), Litton and Monroe can still defeat liability if they can establish the statutory defense that they acted in good faith and did not culpably participate in the violation of section 14(a) by directly or indirectly inducing Casey's violations of the statute with respect to the proxy statement and letter. In the view the district court took of the case this defense was not available to them.

■ The plaintiffs also urge that Litton and Monroe were aiders and abettors in Casey's wrongdoing and are, therefore, liable with him under section 14(a). To sustain this charge the plaintiffs would have the burden of proving the doing of a wrongful act, the alleged aiders' and abettors' knowledge of it and their knowing and substantial participation in the wrongdoing. *Rochez Brothers, Inc. v. Rhoades (Rochez II)*, 527 F.2d 880, 886 (3d Cir. 1975); *Restatement of Torts* § 876(b) (1939); ALI *Fed. Securities Code* § 1419(b) (Oct. 1, 1974 Draft).

■ The determination by the district court, which we have upheld, that Casey negligently failed to perform his duty under section 14(a) establishes the wrongful act. The required knowledge of the act has been defined as a "general awareness [on the part of the aider and abettor] that his role was part of an overall activity that is improper . . ." *SEC v. Coffey*, 493

---

17. *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132 (9th Cir. 1975), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), and *Gordon v. Burr*, 366 F.Supp. 156, 168 (S.D.N.Y.1973),

*modified on other grounds*, 506 F.2d 1080 (2d Cir. 1974), are in accordance with our *Rochez II* holding.

F.2d 1304, 1316 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). This court in its opinion in *Landy v. FDIC,* 486 F.2d 139, 162 (1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), suggests that allegations of knowledge that fall short of stating facts indicating actual knowledge are insufficient. The requirement of knowledge may be less strict where the alleged aider and abettor derives benefits from the wrongdoing but even in this situation the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety. *Northway, Inc. v. TSC Industries, Inc.,* 512 F.2d 324, 339 (7th Cir. 1975).

■ Assuming that an individual's negligent failure to act may be so aided and abetted by another as to make that other equally liable for it,[18] it might be argued that Casey's knowledge or duty to know and negligent failure to act were the knowledge or duty to know and failure to act of Litton and Monroe since he was a senior officer of Litton and an investment committee member of Monroe. It is true, of course, that a corporation's knowledge and action can only be that of its directors, officers and employees.[19] But Casey's knowledge or duty to know and his failure to act as a director of McLean Industries and his knowledge or duty to know and failure to act as an officer of Litton and Monroe must be distinguished.

This court in *Rochez II, supra,* p. 888, held that a corporation did not have the requisite knowledge where the primary perpetrator of the fraud, although he was the chief executive officer of the corporation, acted in his personal capacity and for his personal gain. Casey, of course, was both an officer of Litton and Monroe and a director of McLean Industries and he had personal knowledge that Litton and Monroe had not agreed to vote for the merger of McLean Industries and Reynolds as well as of his own conflict of interest. Litton and Monroe also knew of both since they had executed the agreements involved and Casey's status as an officer of each and at the same time a director of McLean Industries was public knowledge. This knowledge alone, however, would not be sufficient to establish aider and abettor liability on the part of Litton and Monroe under section 14(a). For the aider and abettor must also have knowledge of the illegal act. Here the knowledge that Casey should have had of the falsity of the proxy statement and letter as to the alleged agreement to vote and its inadequacy as to his conflict of interest disclosure and his negligent inaction giving rise to his liability under section 14(a) was knowledge that Casey should have had and action that he should have taken in his capacity as a director of McLean Industries, not as an officer of Litton and Monroe. It would follow that Litton and Monroe, merely through Casey and without more, would not have had actual or constructive knowledge of Casey's negligent violation of section 14(a).

The third element of proof necessary to establish the liability of an aider and abettor, that is, knowingly and substantially participating or assisting in the wrongful act, involves more than mere inaction unless the plaintiffs can show that the inaction was consciously intended to assist in the perpetration of the wrongful act. *Rochez II, supra,* p. 889; *Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364, 374 (7th Cir.), *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974).

Since, as we have held, the district court erred in founding its determination of liability on the part of Litton and Monroe upon the law of agency, the order entered October 23, 1973 and the final judgment entered February 3, 1975 which imposed liability upon them must be vacated and the case remanded for a further hearing on the issue of their liability. At the further hearing the plaintiffs will be free to seek to establish liability on the part of Litton and

---

18. *See Restatement of Torts* § 876, Comment on Clause (b) at 436–437 (1939); 74 *Am.Jur.2d Torts* § 66 (1974).

19. 19 *C.J.S. Corporations* § 1078, pp. 613–615 (1940).

Monroe as controlling persons under section 20(a) or as aiders and abettors or as both and defendants Litton and Monroe will be entitled, with respect to the charge of being controlling persons, to establish, if they can, the defense of good faith and nonculpability which is available to them under section 20(a). We may add that in view of the burden of proof required to establish the relationship of aider and abettor, which we have discussed, it would seem most unlikely, if the plaintiffs should be unsuccessful in establishing Litton's and Monroe's liability under section 20(a), that they could have any greater success in establishing their liability on the theory that they were aiders and abettors. For as a practical matter it would appear to be quite likely that the evidence produced to establish and to defeat liability on each of these theories would be identical.

## DAMAGES

We consider, finally, the award of damages made by the district court. At the outset of our consideration we note that the plaintiffs stipulated in the district court that they would not contend that the shares of Reynolds preferred stock which they received in exchange for their McLean Industries common stock had an intrinsic or appraised market value that was less than the intrinsic or appraised market value of the McLean Industries common stock or that their earnings or earnings potential were less than those of that stock. Thus they do not contend that they suffered an out of pocket loss as a result of the merger.

Section 28(a) of the Act, 15 U.S.C.A. § 78bb, provides that "no person permitted to maintain a suit for damages under the provisions of this title shall recover . . . a total amount in excess of his actual damages on account of the act complained of." This limitation applies to suits brought to recover damages for the violation of section 14(a) of the Act, since they are provided for by implication by that section.[20] But while the Act speaks in terms of "actual" damages the dichotomy is between actual and punitive damages[21] and recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment,[22] unless the loss is wholly speculative.[23] In *J. I. Case Co. v. Borak*, 377 U.S. 426, 435, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423, 429 (1964), the Supreme Court made it clear that in a civil suit, such as the one before us, which is brought to redress a violation of section 14(a) of the Act the "federal courts have the power to grant all necessary remedial relief . . . ." The defendants urge that the subsequent decision of the Court in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), limited the ruling in the *Borak* case. We do not agree. As Judge Friendly pointed out in *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1304 (2d Cir. 1973), the *Mills* decision should be read "as commanding the lower courts to do their

20. *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559–60, 12 L.Ed.2d 423, 427 (1964).

21. *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223, 1229–1232 (10th Cir. 1970); *Green v. Wolf Corp.*, 406 F.2d 291, 302–303 (2d Cir. 1968), *cert. denied, Troster Singer & Co. v. Green*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Myzel v. Fields*, 386 F.2d 718, 748 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

22. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741, 762 (1972); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 586 (3d Cir. 1975); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 (2d Cir. 1973); *Myzel v. Fields*, 386 F.2d 718, 748–749 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); *Abrahamson v. Fleschner*, 392 F.Supp. 740, 746 (S.D.N.Y.1975).

23. *Rochez Brothers, Inc. v. Rhoades (Rochez III )*, 527 F.2d 891, 895 (3d Cir. 1975); *Wolf v. Frank*, 477 F.2d 467, 478 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *Abrahamson v. Fleschner*, 392 F.Supp. 740, 746 (S.D.N.Y.1975); *Schaefer v. First National Bank of Lincolnwood*, 326 F.Supp. 1186, 1193 (N.D.Ill.1970), *appeal dismissed*, 465 F.2d 234 (7th Cir. 1972).

best to achieve fair compensation for injured plaintiffs without being too draconian on defendants, at least in a situation where the inadequacy of a proxy statement may lie more in a failure of articulation than in an outright desire to deceive."

■ The district court held, and we agree, that while the material defects in the proxy statement and letter were not related to the terms of the merger in the strict sense of misstating what the shareholders were going to receive, they were relevant to the dichotomy between what the favored shareholders and the plaintiffs were to receive. The court accordingly held that by the circulation to them of the defective proxy materials the plaintiffs were lulled to inaction and thereby suffered the loss of an opportunity to attempt to secure a merger agreement which would be more favorable to them. The court thus found the fact of injury to be sufficiently established, a finding which we cannot say was clearly erroneous. The determination of the amount of the plaintiffs' damages involves other problems, however. For there is a clear distinction between the measure of proof necessary to establish the fact a plaintiff has sustained an injury, and the measure of proof necessary to enable the jury to fix the amount of damages resulting from that injury.[24]

■ It is always difficult to measure the damages resulting from a lost opportunity, especially one, such as we have here, which has no ascertainable market value. Many imponderables are involved. In the more common situation of a lost opportunity to win a prize the general rule in this country appears to be that damages, measured by the amount of the prize, are to be awarded, but only if it is more probable that the prize would have been won if the opportunity had been afforded than that it would not have been won. In England the amount of damages awarded in such a situation is based on the extent of the probability of winning, a comparative test. It appears that the latter rule has been followed by some American courts. It has been suggested that the majority American rule may stem from an unexpressed feeling by the courts that the award of damages in such cases is not to be favored.[25] In a case such as the present one, however, which is brought to redress a violation of section 14(a) of the Act the policy of the law is quite the contrary.[26] Moreover, here there is no known fixed amount, such as a prize, the opportunity to acquire which has been lost. In these cases the risk of uncertainty as to the amount of damages is cast on the wrongdoer [27] and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case. If this were not so, section 14(a) could be violated with impunity in any situation in which the violation does not cause out of pocket loss.

In the present case the district court stated that while it was possible that full disclosure and correction of the defective proxy materials would not have affected the terms of the merger it was equally possible that such disclosure might have resulted in the favored defendants sharing with plaintiffs the premium of $8.25 per share which the former received.[28] The court rightly

24. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548 (1931).

25. 6 *Wayne L.Rev.* 225, 246 (1960). *See also* 37 *Saskatchewan L.Rev.* 193 (1972–1973) and 18 *Rutgers L.Rev.* 875 (1964) in which the American majority rule and the English rule are compared.

26. *See J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 428 (1964).

27. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–265, 66 S.Ct. 574, 579–80, 90 L.Ed. 652, 660 (1946); *Simon v. New Haven Board & Carton Co., Inc.,* 516 F.2d 303, 306 (2d Cir. 1975); *Moses v. Burgin,* 445 F.2d 369, 385 (1st Cir.) *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971).

28. The court held that the sum of $8.25 per share, the difference between the $50 per share received by the favored shareholders and the $41.75 per share which was the market value on the first trading day after the merger of the Reynolds preferred stock received by the plaintiffs, represented a premium received by the former.

pointed out that in these circumstances the defendants as the parties responsible for the defects should bear the risk of the uncertainty and that it would be unfair to require the plaintiffs to prove that they would have received a greater compensation. The court treated $8.25 per share as the outside limit of the damages which the plaintiffs suffered, and it ultimately found that the best and most equitable estimate which could be made as to what the plaintiffs might have obtained by renegotiation was a *pro rata* share in the premium of $8.25 received by defendants Litton and Monroe.

The plaintiffs urge that they are entitled to recover the full premium of $8.25 for each and every share of McLean Industries common stock which they held. This claim is based upon the contention that the proxy statement represented that the Reynolds preferred shares to be received by them in the merger in exchange for their McLean Industries stock were worth $50 each and that the Reynolds shares proved to be worth only $41.75 each after the merger took place. The trouble with this proposition is that, as the district court correctly found, no such representation of value was made in the proxy statement. Nor, as we have indicated earlier, was the omission of any valuation of the Reynolds preferred shares a violation of section 14(a). This contention of the plaintiffs must accordingly be rejected.

The plaintiffs also contend that Reynolds' original alternative offer to all McLean Industries shareholders of $50 per share in cash for their stock and the eventual receipt by the favored defendants of that amount is evidence that the McLean Industries stock had a "merger value" in excess of its market price and not less than $50 per share and that the plaintiffs' damage is, therefore, the difference between what they received and $50. This contention would appear to be in conflict with the parties' stipulation that the plaintiffs received a fair exchange of value for their McLean Industries stock under the terms of the merger. Moreover, the plaintiffs do not indicate in what way their failure to receive for their stock a consideration commensurate with an alleged merger value is violative of section 14(a) of the Act as implemented by Rule 14a–9(a) which mandates full disclosure of facts material to informed decision-making by shareholders but which, as we have indicated, discourages valuation estimates. The contention must, therefore, be rejected.

The measure of damages which the district court did adopt was as follows: The premium received by the favored defendants on their McLean Industries common stock was $8.25 per share, the difference between the $50 each per share which they received and $41.75, the market value on the day following the merger of the Reynolds preferred stock received by the other shareholders in the merger. The total premium received by the nonsettling defendants Litton and Monroe on their 1,050,000 shares was, therefore, $8,662,500. In this latter amount the court held that the plaintiffs should share in the proportion which the aggregate number of their shares bore to 10,632,000, the total number of shares of McLean Industries common stock outstanding. In making this computation, the court directed that the shares of McLean Industries common stock, the holders of which had demanded appraisal and had received $45 per share in cash, should be included, and that the sum of $4,000,000 received by the plaintiffs from the settling defendants should not be credited. But stipulation of the parties it appeared that the McLean Industries common shares held by the entire class of plaintiffs totalled 2,983,813. This total included 185,123 appraised shares. In accordance with the method of computation which it had adopted the court entered final judgment on February 3, 1975 in favor of the plaintiffs and against defendants Litton, Monroe and Casey in the sum of $2,431,083.53.

We cannot hold erroneous the district court's finding that the logical esti-

mate of the loss which the plaintiffs suffered as the result of the circulation to them of the deficient proxy materials was a *pro rata* share of the premium received by the favored defendants in the merger. But we do not agree with the method which the court adopted to compute the share of the premium to be used to compensate for that loss. We bear in mind that the district court expressly found that the defendants were liable only for negligence, 351 F.Supp. at 868–869, and that the deficiencies in the proxy statement and letter, while clearly material, were more peripheral than central. Under the circumstances, we think that fairness requires that the plaintiffs' loss, and hence the damages to be awarded, should be measured by the amount of premium which the plaintiffs would have received if the total amount of premium received by all the favored shareholders, not merely Litton and Monroe, had been allotted to all the issued and outstanding common shares *pro rata*. On such a basis the damages to be awarded to the plaintiffs would be at the rate of $1.7878 per share.[29]

Since the shareholders who had their shares appraised in the merger were paid $45 per share in cash they actually received a premium of more than this, namely $3.25 per share, over the market value of $41.75 per share for the Reynolds preferred shares which the other shareholders received. Section 28(a) of the Act prohibits the recovery of more than actual damages in an action such as the one before us. Since the loss suffered by the other plaintiffs was not shared by the holders of the appraised shares we think that they must be excluded from the computation. When this is done, the number of eligible shares held by the plaintiffs is reduced to 2,798,690 and the

amount of the plaintiffs' loss to $5,003,-497.98. We think also that upon the amount thus determined to be the plaintiffs' loss the sum of $4,000,000 paid to them by the settling defendants should be credited.[30] This would be in conformity with the spirit, if not the letter, of section 28 of the Act which, in addition to limiting recovery under the Act to actual, as distinguished from punitive, damages, expressly prohibits the recovery in one or more actions of a total amount in excess of the plaintiffs' actual damages. It would appear that the district court sought to achieve this result by limiting to the premium received by Litton and Monroe the amount in which the plaintiffs should share while denying credit for the settlement payment of $4,000,000. That payment, however, was obviously made in discharge of the settling defendants' obligation to the plaintiffs, an obligation which had the same basis as that of Litton, Monroe and Casey. It must, therefore, be considered as a recovery within the meaning of section 28(a). We conclude that in computing the damages it was error not to consider the whole picture instead of merely part of it. Crediting $4,000,000 upon the plaintiffs' total loss of $5,003,497, leaves $1,003,497.98 for which they are now entitled to judgment.

## PREJUDGMENT INTEREST

The plaintiffs urge that the district court erred in denying prejudgment interest on the amount awarded, from the date of the merger to the date of judgment. The award of prejudgment interest in a suit for the violation of section 14(a) of the Act is within the discretion of the district court which is to be exercised in accordance with

29. The favored shareholders, Litton, Monroe, National Bulk, American-Hawaiian and Kroeger, held 2,304,000 shares. At $8.25 per share they received a total premium of $19,008,000. Dividing 10,632,000, the total number of outstanding shares of common stock, into $19,-008,000 gives a premium of $1.7878 per outstanding share.

30. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77, 97 (1971); *Snowden v. D.C. Transit System, Inc.,* 147 U.S.App.D.C. 204, 454 F.2d 1047 (1971); *Schaefer v. First National Bank of Lincolnwood,* 326 F.Supp. 1186, 1192–1193 (N.D.Ill.1970), *appeal dismissed,* 465 F.2d 234 (7th Cir. 1972); *Restatement of Torts*

principles of fairness.[31] Here the award of damages is made to redress the violation of section 14(a) of the Act by the circulation of a materially deficient proxy statement and letter. The award is not made to make the plaintiffs whole for funds to which they were legally entitled at the time of the merger. We find no abuse of the court's discretion in its denial of prejudgment interest.

The district court's order entered October 23, 1973 and its final judgment entered February 3, 1975 will be vacated and the cause will be remanded to that court for further proceedings not inconsistent with this opinion.

VAN DUSEN, Circuit Judge (concurring and dissenting):

I respectfully dissent from the conclusions reached by the majority opinion under (a) at pages 771–773, (c) at pages 773–774 and (a) at pages 775–777, because they affirm the district court's holding[1] that the individual defendant, Casey, is liable as a matter of law on summary judgment despite the uncontradicted affidavit of Malcolm McLean (80a–83a, 85a), related deposition testimony (see, for example, 694a), and exhibits (see, for example, DX–82 at 627a).

I believe that Casey was entitled to a trial, since the above evidence and reasonable inferences therefrom indicate (1) that the McLean Company needed 300 million to 500 million dollars in order to continue to compete in the container shipping business, (2) that McLean common stock would have been worth far less than $40.00 per share if Reynolds had not promptly supplied credit to this enterprise, and (3) that no other source of such credit was available. Further, Casey was entitled to show at a trial

that Reynolds would have withdrawn from this venture if it had not been consummated promptly by payment of the "premium" to the large stockholders, since their favorable vote was essential to secure the two-thirds stockholder vote required for approval of the merger.

In my view, the above-described evidence was sufficient to create fact issues, the resolution of which in Casey's favor at a trial could have resulted in a determination that any misrepresentations and omissions described in parts (a) and (c) of the majority opinion were not material. See *Laurenzano v. Einbender*, 448 F.2d 1, 5–6 (2d Cir. 1971). Casey should have the opportunity to prove that, as a practical matter, the "favored defendants" would have voted, and fully intended to vote, for the merger in any event. Even accepting the conclusion that the proxy materials were misleading because there was no legally binding obligation to vote for the merger, the disparity between the actual facts and the misstated facts may be insignificant and the misstatement therefore immaterial. See *Laurenzano v. Einbender, supra.* In addition, I believe reasonable men could differ on the adequacy of the disclosure of the various conflicts and that that issue should not be determined as a matter of law. The relevant information is contained in the first few pages of the proxy materials and, as we stated in *Kohn v. American Metal Climax*, 458 F.2d 255, 267 (3d Cir. 1972), "reasonable latitude in this area is important if nit-picking is not to become the name of the game."

Where the record at a hearing on motion for summary judgment discloses issues of fact, a trial is required. See, *e. g., Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3d

---

§ 885(3) (1939); Prosser, *Law of Torts* 304–305 (4th ed. 1971).

**31.** *See Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403, 411 (1962); *Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 589 (3d Cir. 1975); *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973).

**1.** I note that the district court appears to have adopted and applied the more liberal test of materiality explicitly rejected by the majority at pages 770–771. *Gould v. American-Hawaiian Steamship Co.,* 319 F.Supp. 795, 802 (D.Del.1970); see *General Time Corp. v. Talley Industries,* 403 F.2d 159, 162 (2d Cir. 1968).

Cir. 1972); 10 Wright & Miller, Federal Practice & Procedure: Civil § 2716 (1973). Where a judgment of over one million dollars is involved, surely this principle should not be overlooked.

Finally, because material favorable to Casey, including the evidence described in the first sentence of this dissent and the inferences from such evidence could be very pertinent in his defense to the contention that he is liable for negligence, I do not believe Casey can be held to have been negligent as a matter of law, as determined by the majority opinion at pages 775–777. The only evidence at this stage on the negligence issue is that Casey read the proxy statement in draft form and failed to correct it. In my view, that evidence, standing alone, is not a sufficient basis for holding Casey, who is neither a lawyer nor an inside director, liable by summary procedure. I believe Casey was entitled to a decision by a fact finder after trial on the factual issues needed to determine whether a reasonable director in his position was negligent in not objecting to, or referring to Monroe's or Litton's counsel, the possible omissions, including failure adequately to reveal conflicts of interest, in the proxy materials.

There is no proof that Casey was consciously aware of the alleged misstatements and omissions or of their materiality. The critical question is whether he should have noticed and corrected the defects. But the defects themselves are quite technical. The defect relating to the alleged agreement to vote hinges on reading the language of the proxy materials as connoting a legally binding obligation to vote for the merger on the part of Litton and Monroe. Similarly, the thrust of the majority opinion with respect to the disclosure of the alleged conflicts of interest is that Casey should have realized that the relevant facts were not presented in sufficiently prominent form and that the disclosure was therefore inadequate. As a non-lawyer and an outside director, Casey might easily be excused for not having his antennae so finely tuned to semantic and formal "defects." In any event, he should be permitted to show that, under the circumstances of this case, particularly those noted in the first sentence of this dissent and this paragraph, he would have reasonably considered these misstatements and omissions to be insignificant.

In all other respects, I join in Judge Maris' characteristically excellent opinion, although, under my view stated above, it would not be necessary to reach the damage issue at pages 781–784 and the prejudgment interest issue at pages 784–785 of the majority opinion.